**LUMBERMEN'S MUTUAL CASUALTY COMPANY, a corporation, Appellant,**

v.

**NORRIS GRAIN COMPANY, a Tennessee Corporation, and Norris Grain Company, an Illinois corporation, Appellees.**

No. 17654.

United States Court of Appeals Eighth Circuit.

March 15, 1965.

Donald F. Flint, of Flint & Newman, St. Louis, Mo., Morton R. Newman, of Flint & Newman, St. Louis, Mo., for appellant.

Edward Weakley, of Boyle, Priest, Elliott & Weakley, St. Louis, Mo., Aubrey B. Hamilton, of Hamilton and Armstrong, St. Louis, Mo., for appellees.

Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and DELEHANT, Senior District Judge.

DELEHANT, Senior District Judge.

The appellant (sole defendant in the district court and herein so designated) appeals from the judgment of the United States District Court for the Eastern District of Missouri, Eastern Division, against it and in favor of the appellees (plaintiffs in the district court and herein so designated) for the sum of $115,-460.49, made and given September 24, 1963, upon the verdict of the jury found and returned on that date, in this action, which was then pending in the District Court between the parties. The amount of the judgment, supra, was arrived at by adding to the aggregate sum of the jury's award, namely, $102,552.80, interest thereon in the stipulated and agreed sum of $12,907.69. The stipulation or agreement is operative only on the amount of the interest, if the jury's award itself be allowed to stand.

The action was instituted,[1] and has been prosecuted to recover from the defendant, (a) sums of money alleged to be due and owing from it to the plaintiff (later, plaintiffs) under a policy of insurance executed and issued by the defendant to and in favor of both of the plaintiffs, and of sundry other named beneficiaries, as well as to and in favor of, still other described, but unnamed beneficiaries or "assureds," vide infra, and (b) sums of money alleged to be due and owing from the defendant to the plaintiff (plaintiffs) in enforcement of Section 375.420 RSMo 1959, V.A.M.S., on the ground that the defendants' denial and resistance of the claim was and is vexatious, within the meaning of that statute, infra.

By the pleadings, it is agreed that the defendant is, and at all material times was, a corporation incorporated under the laws of Illinois, and qualified to do business in Missouri, by and through

1. See observations, infra, respecting its original institution and removal, and the inclusion of an additional plaintiff and amendments of pleadings.

its agents located in Missouri, and engaged in the insurance business for hire in the City of St. Louis, Missouri, and registered in the Division of Insurance of the State of Missouri under the laws of Missouri applying to insurance companies.

The case was commenced in the Circuit Court of the City of St. Louis, Missouri, by the plaintiff, Norris Grain Company, a corporation organized and existing under the laws of Tennessee, authorized to transact business within Missouri, whose general offices are located at Number 112 North 4th Street, St. Louis, Missouri, against the defendant. The defendant, timely thereafter, and on January 11, 1962, filed in the United States District Court for the Eastern District of Missouri, Eastern Division, its Petition and Bond for Removal to the latter court of the action so instituted, and timely thereafter gave due notice of the filing of such Petition and Bond for Removal. On March 5, 1962 the case was assigned to Court No. 1, Chief Judge Roy W. Harper presiding, under whose judicial supervision it has generally proceeded thereafter in the District Court. On May 18, 1962, with no change of, or addition to, parties, the original plaintiff, with leave therefor, filed an Amended Petition[2] in the District Court. On June 4, 1962, the defendant filed in that court a motion to dismiss both of the then two counts of the Amended Petition for failure to state a claim on which relief can be granted, in that the then plaintiff was not the "first named assured" in the contract of insurance, which "first named assured," the motion asserted, alone "may act for itself and for each and all of the assureds for all purposes of the policy;" and to dismiss Count II of the Amended Petition for failure to state a claim on which relief can be granted, upon the separately assigned bases, first, that such Count II

was for recovery under the policy's Insuring Agreement V for loss resulting from forgery, despite the exclusion from coverage under such Agreement V, of losses resulting from employee dishonesty, and secondly, that the then sole plaintiff was the assignee, only, of a claim for loss resulting from dishonesty of certain employees. On January 15, 1963, the trial court made and entered an Order overruling that Motion to Dismiss in all respects.[3] On January 25, 1963, the defendant filed its answer to the Amended Petition and Demand for Trial by Jury. It also then filed request for admissions, to which, shortly thereafter, plaintiff filed objection, which objection was overruled on March 1, 1963. On February 7, 1963 (after the filing of its request for admissions), the defendant filed a Motion for Summary Judgment.

Thereafter, and on February 20, 1963, the plaintiff moved for leave to file a Second Amended Petition, and therein and thereafter to add as another party plaintiff, Norris Grain Company, an Illinois corporation; and concurrently therewith "lodged" in the files, the proposed Second Amended Petition. On March 1, 1963, the trial court (in addition to its action overruling the objections to the defendant's Request for Admissions, supra), took submission of, and denied and overruled, the defendant's Motion for Summary Judgment, and also took submission of, and sustained and granted, plaintiff's Motion for Leave to file Second Amended Petition, and to make Norris Grain Company, an Illinois corporation, an additional party plaintiff. And the Second Amended Petition (theretofore marked as "lodged," supra) was filed. On March 11, 1963, the defendant's Answer to Plaintiff's Second Amended Petition was filed. It is that Second Amended Petition and the Answer thereto which, ultimately, reflect the issues in the action, but with this

---

2. Evidently, carrying forward the designation of the plaintiff's statement of claim in the state court, rather than employing the designation, "complaint," more appropriate in the Federal trial court.

3. But observe the later dismissal by the plaintiffs, themselves, of Count II in open court at the inception of the trial, infra.

reservation, namely, that on September 16, 1963, upon the opening of the trial of the action, the plaintiffs, by leave of court then granted, dismissed Count II of the Second Amended Petition. Therefore, the action proceeded to trial upon Count I of the Second Amended Petition, and the defendant's Answer to such Count I.

The foregoing admittedly extended recollection of the history of the pleadings in the action is probably not strictly necessary for the present purposes of this court. It is, nevertheless, offered, among other reasons, out of regard for its conceivable bearing upon the issues arising from the defendant's contention that the judgment, supra, must be reversed, and the action—now Count I of the Second Amended Petition—must be dismissed for the asserted want of the timely participation in the prosecution of the claim in suit by the only party competent under the Policy to proceed as plaintiff herein, *et supra, et infra.*

By Count I of that Second Amended Petition, the plaintiffs, first, allege the facts, and the States, of their respective incorporations, the authority for, and acuality of, their engagement, in the State of Missouri, and in the City of St. Louis therein, and elsewhere, "in the business of purchasing, selling and storing grains, soy beans and other related products;" and the defendant's incorporation in Illinois, authorization to do, and actual doing of, business as an insurer for hire in the State of Missouri, and the City of St. Louis therein (all as already recited herein). By paragraph 3 of such Second Amended Petition, they allege:

"3. On or about the 15th day of December, 1956, in consideration of the payment to the defendant of the premium of Six Thousand Seven

Hundred Seventy Two and 62/100 ($6,772.62), defendant issued and delivered to Norris Grain Company; Norris Grain Company, Ltd.; Bruce A. Norris; Arthur R. Kneibler, Jr.; Eleanor Norris Kneibler; Marguerite L. Norris; Marguerite Ann Norris and all subsidiary, related or affiliated companies now owned or controlled or which may hereafter be acquired or controlled by the named assureds, its Policy No. F-54,200, and for a further premium to it paid in the sum of Two Thousand Seven Hundred Twenty-two and 26/100 ($2,722.26), defendant extended the term of said policy of Fidelity and Indemnity Insurance, a continuing insuring agreement nominated by the defendant generally as 'Employee Dishonesty Coverage—Form A, Safe Deposit Box Coverage and Depositors Forgery Coverage,' whereby defendant promised and agreed to indemnify and save harmless those designated in the policy as 'the assured' for all losses sustained by them during the period beginning the 15th day of December, 1956, and continuing as long thereafter as said policy should remain in force and effect according to the provisions of said policy and in the amounts therein limited as follows:

"Insuring Agreement I, Employee Dishonesty Coverage—Form A, $500,000.00 caused by any fraudulent or dishonest act or acts committed anywhere by any of the employees of the assured acting alone or in collusion with others and including losses caused by the fraud or dishonesty of any one or more employees whom (sic) are unidentifiable.[4] "

---

4. This quotation is followed by the incorporation into the pleading of the policy by reference and a copy of such policy. It is regarded as desirable to, and this court does, insert here a copy of the "Insuring Agreement I," of which the portion of the quotation from the pleading to which this footnote is subjoined is only an accurate interpretation. It follows:

"INSURING AGREEMENTS

"EMPLOYEE DISHONESTY COVERAGE—FORM A

"1. Through any fraudulent or dishonest act or acts, committed anywhere

A copy of said Policy No. F-54,200, marked Exhibit A, is attached hereto and made a part hereof. Said policy was not cancelled or otherwise terminated and was in force and effect at the time of the losses herein complained of."

The exact language of the policy identifying the "Assureds" within its protection is contained in "Schedule A" attached to and incorporated into the policy in the following language:

"SCHEDULE 'A'

Norris Grain Company

Norris Grain Company, Ltd.

Bruce A. Norris

Arthur R. Kneibler, Jr.

Eleanor Norris Kneibler

Marguerite L. Norris

Marguerite Ann Norris, and all subsidiary, related or affiliated companies now owned or controlled or which may hereafter be acquired or controlled by the named Assureds.

Signed, sealed and dated this 4th day of January, 1957.

LUMBERMENS MUTUAL
CASUALTY COMPANY

By Jack R. Young,
Jack R. Young, Attorney-in-Fact"

Let it be observed that the policy itself, like the foregoing schedule A, was executed and dated, January 4, 1957, but it was expressly made effective from and after December 15, 1956. It is also recalled that by paragraph "D" of the policy's GENERAL AGREEMENTS, it was provided, in part, that:

"D. If more than one Assured is covered under this policy, the first named Assured shall act for itself and for each and all of the Assured for all of the purposes of this Policy."

In the several paragraphs of the Second Amended Petition following paragraph numbered 3 quoted above, the plaintiffs make allegations that are summarized briefly as follows:

By Paragraph 4, the status, at all times mentioned in the Second Amended Petition, as an "Assured" under the policy, of the Norris Grain Corporation; the change of its name to Norris Grain Corporation of St. Louis, Missouri in June, 1960; and its action, on or about June 30, 1960, in assigning its rights and interests in the policy to plaintiff Norris Grain Company, a Tennessee Corporation, as well as "All other business, assets, and liabilities of Norris Grain Corporation."

By Paragraph numbered 5, the allegation that, during the term of the policy, and, more specifically, during the period from December 1, 1959 to December 31, 1959, Norris Grain Cor-

by any of the Employees acting alone or in collusion with others, including loss of Money and Securities and other property through any such act or acts of any of the Employees, and including that part of any inventory shortage which the Assured shall conclusively prove to have been caused by the fraud or dishonesty of any of the Employees, provided that the Company's aggregate liability as to all Employees shall not exceed the Limit of Liability applicable to this Insuring Agreement 1, subject, however, to the provisions of Section 9.

"LOSS CAUSED BY UNIDENTI-
FIABLE EMPLOYEES

If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Assured shall be unable to designate the specific Employee or Employees causing such loss, the Assured shall nevertheless have the benefit of this Insuring Agreement 1, provided that the evidence submitted reasonably (in case of inventory shortage, conclusively) establishes that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided further that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to this Insuring Agreement 1."

The immediately foregoing quotation from the policy is subjoined to, and definitive of, the following designation, prescription and limitation of the coverage under Insurance Agreement I:

"LIMITS OF LIABILITY

"Insuring Agreement I EMPLOYEES DISHONESTY COVERAGE—FORM A $500,000.00."

poration, subsequently Norris Grain Corporation of St. Louis, Missouri (supra), "was caused to suffer a loss of $85,800.00 by reason of the fraud and dishonesty of one or more of its employees, alone or in collusion with others, in the receiving of grains and beans at its facility at 4800 North Wharf, St. Louis, Missouri, and the false recording of said receipts for the purpose of authorizing and causing improper and excessive payments by plaintiff to those from whom said employee or employees falsely reported the receipts aforesaid."

By Paragraph numbered 6, the discovery of such loss in January, 1960, and the giving to the defendant on or about April 22, 1960 of due notice and proof of such loss, and that "said amount of loss has become due and payable for which demand has been made."

By Paragraph numbered 7, the furnishing thereafter by plaintiffs and both of them, to the defendant, of all information and material requested by the defendant in the course of its investigation; the acceptance and processing by the defendant of the proof of loss; the defendant's denial on or about March 2, 1961 of liability under such policy for said loss, and its failure and refusal, and persistence therein, to pay such amount.

By Paragraph numbered 8, the Assureds' keeping and performance of, and compliance with, all of the terms, provisions and conditions of the policy since its execution, and furnishing to the defendant, under the terms, conditions and covenants of the policy, of due notice of such loss; and the failure by the defendant, at any time, to tender to the Assureds, any refund or return of the premiums paid by them to the defendant.

And, by Paragraph numbered 9, the averment that the refusal of the defendant to pay the loss under the policy was and is vexatious and without reasonable cause; on account whereof,

the Assureds are entitled to damages therefor in the sum of $8,580.00 and, as a reasonable sum as an attorneys fee, the sum of $20,000.00.

And the Second Amended Petition was concluded by the plaintiffs with a prayer for judgment in the sum of $85,800.00, with interest thereon from December 31, 1959 at the rate of six per cent per annum, and, in addition thereto, the further sum of $8,580.00 as damages, and $20,-000.00 as an attorney's fee, together with costs.

On March 11, 1963, the defendant filed its answer to the Second Amended Petition. In respect of Count I of such Second Amended Petition, that Answer undertook to, and did tender two separate defenses. The first such defense was the assertion that the "Second Amended Petition fails to state a claim against defendant upon which relief can be granted." The second such defense responds entirely to the facts averred in the Second Amended Petition. In such second defense, the defendant,

a) Admits in their entirety, (1) the allegations in the Second Amended Petition, of the defendant's incorporation under the laws of Illinois, its qualification to do, and engagement in doing, business as an insurer for hire in the State of Missouri and in the City of St. Louis, Missouri and elsewhere, and its due registration in the Division of Insurance of the State of Missouri, all as alleged in the plaintiffs' Second Amended Petition; and (2) the allegations of paragraph numbered 3 of the Second Amended Petition, all as already copied herein, supra;

b) Alleges its lack of knowledge or information sufficient to form a belief as to the truth of (1) the allegations touching the facts and the status of the incorporation of the two several plaintiffs, the authority for, and actuality of, the engagement, in the State of Missouri, and in the City of St. Louis therein and elsewhere, by those two plaintiffs, "in the business of purchasing, selling and storing

grains, soy beans and other related products;" and also alleges its lack of knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph number-ed 4 of Plaintiffs' Second Amended Petition (which allegations have late-ly been summarized in this memoran-dum, supra); and thereby puts the plaintiffs upon proof of each such fact, in respect of which it thus pro-fessed such lack of knowledge or in-formation;

c) Admits, in relation to Paragraph numbered 6 of Plaintiffs' Second Amended Petition, only that a proof of loss was filed with the defendant on or about April 22, 1960, making claim under the insurance policy which is the subject matter of the suit, but denies all of the further allegations of that paragraph of the Second Amended Petition, as sum-marized herein, supra; and,

d) Denies each and all of the allega-tions contained in paragraphs num-bered 5, 7, 8 and 9 of such Second Amended Petition (concerning the na-ture of which allegations thus denied, vide supra).

The action came on for trial to the District Court with a jury, Chief Judge Harper presiding, on September 16, 1963.

Counsel for plaintiffs made an oral opening statement, at the close of which, the defendant filed and tendered a mo-tion for a directed verdict in its behalf "upon the ground that the plaintiff (sic) has failed to state a cause of action in its opening statement upon which a claim can be based." In its essence, that mo-tion was a "demurrer to the opening statement." The motion was submitted to the trial court, and, by that court, was denied and refused. Thereupon the trial proceeded and, with some intermis-sions, continued through several days. During it, the plaintiffs introduced evi-dence at considerable length and rested, after which, the defendant made and tendered a motion for a directed verdict in its behalf, and against the plaintiffs, which motion was then submitted to the trial court, by which ruling on such mo-tion was reserved.

The defendant, thereupon, introduced its evidence and rested. At the close of all of the evidence and testimony, the defendant again moved for a directed verdict in its behalf and against the plaintiffs. That motion was submitted to the court, by which ruling on the mo-tion was reserved. The plaintiffs then also moved for a directed verdict in their behalf and against the defendant; and that motion was submitted to the court, and by the court was denied and over-ruled.

Oral arguments of counsel for the sev-eral parties were made. And the charge of the court was imparted to the jury. No exception was taken to the charge by any party to the suit. Concerning the substance of the charge, vide infra. Thereafter, the jury found and returned a verdict, whose language, omitting cap-tion and signature, follows:

"We, the jury in the above entitled cause, find the issues herein joined in favor of Norris Grain Company, a Tennessee Corporation and Norris Grain Company, a Illinois Corpora-tion, and against the Defendant, Lumbermens Mutual Casualty Com-pany, a Corporation, and we assess Plaintiffs' damage for loss sustained under the policy sued on in the sum of Eighty-Three Thousand Nine Hundred Ninety-Eight ($83,998.00) Dollars.

"We further find that the Defend-ant has been guilty of vexatious de-lay in refusing to pay said loss.

"We further find and assess against Defendant damages for vexatious de-lay in refusing to pay said loss in the sum of Eight Thousand Three Hundred Ninety-Nine and 80/100 ($8,399.80) Dollars.

"And we further find and assess against Defendant, Plaintiffs' Attor-neys' Fees for services in this cause in the sum of Ten Thousand One Hundred Fifty-Five ($10,155.00) Dollars.

"Aggregating the total sum of One Hundred Two Thousand Five Hundred Fifty-Two and 80/100 ($102,-552.80) Dollars."

On the receipt of that verdict, the parties, by their counsel signed, executed and lodged with the clerk the following:

"Memorandum for Clerk.

"By leave and agreement, all parties hereto agree that interest on the judgment entered herein figured at 6% of (sic) $83,998 from March 2, 1961, to and including Sept. 24, 1963, is and shall be $12,907.69."

That memorandum was signed by counsel for all litigants, and, by the trial judge, was endorsed "By Leave Filed. R.W.H.", those capital letters being the initial letters of his name.

Judgment was thereupon, and on September 24, 1963, made and given upon the verdict, along with such "Memorandum for Clerk," in favor of the plaintiffs and against the defendant in the sum of $115,460.49.

On October 4, 1963, the defendant filed in the District Court a motion to set aside such verdict and judgment, and to enter judgment in favor of the defendant, in accordance with its Motion for Directed Verdict, or, in the alternative, for a New Trial.

As grounds for its primary motion to vacate the judgment and to enter judgment for defendant, the defendant, by such motion, advanced claims which are summarized thus:

1) No evidence was offered or received tending to prove a claim on which relief could be granted to plaintiffs;

2) No evidence was offered or received tending to prove the occurrence of a loss to plaintiffs during the interval from December 1, 1959 to December 31, 1959;

3) No evidence was offered or received which went beyond the point of creating a mere surmise or suspicion that the asserted loss was caused by the fraud or dishonesty of one or more of plaintiffs' employees, identifiable or unidentifiable, acting alone or in collusion with others;

4) No evidence was offered or received which fairly and reasonably excluded all explanations for the asserted loss other than that it was caused by the fraud and dishonesty of one or more of plaintiffs' employees, identifiable or unidentifiable, acting alone or in collusion with others;

5) Plaintiffs' opening statement did not state facts which, if proved, would constitute a claim for which relief could be granted;

6) Plaintiffs' opening statement did not state facts which, if proved, would constitute a claim for which damages for vexatious refusal to pay could be granted;

7) Plaintiffs' opening statement did not include a demand for recovery of damages for vexatious refusal to pay;

8) No evidence was offered or received tending to prove that Norris Grain Company, an Illinois corporation, complied with all of the terms and conditions of the policy of insurance introduced in evidence;

9) No evidence was offered or received tending to prove that Norris Grain Company, an Illinois corporation, suffered a loss; and,

10) No evidence was offered or received which tended to prove that the petition filed by Norris Grain Company, an Illinois corporation, was filed within two years after notification to that plaintiff of the alleged loss.

As grounds for its alternative, or contingent, Motion for a New Trial, the defendant advanced claims which are summarized thus:

1) Error by the court in admitting incompetent, irrelevant and immaterial evidence offered by plaintiffs and over objection of defendant (not otherwise specified);

2) Error by the court in excluding competent, relevant and material evidence offered by defendant (not otherwise specified);

3) Error by the court in denying and overruling defendant's motion for a directed verdict at the close of plaintiffs' opening statement;

4) Error by the court in denying and overruling defendant's motion for a directed verdict at the close of plaintiffs' evidence;

5) Error by the court in denying and overruling defendant's motion for a directed verdict at the close of all the evidence;

6) The verdict is against the evidence;

7) The verdict is against the greater weight of credible evidence;

8) The verdict is against the law under the evidence;

9) No credible evidence was offered or received, tending to prove that a loss occurred to plaintiffs during the interval from December 1, 1959 to December 31, 1959;

10) No credible evidence was offered or received, which fairly and reasonably excluded all explanations for the alleged loss other than its causation by the fraud and dishonesty of one or more of plaintiffs' employees, identifiable or unidentifiable, acting alone or in collusion with others;

11) No credible evidence was offered or received, which tended to prove that Norris Grain Company, an Illinois corporation, complied with all the terms and conditions of the policy of insurance introduced into evidence;

12) No evidence was offered or received which tended to prove that Norris Grain Company, an Illinois corporation, suffered a loss;

13) No evidence was offered or received which tended to prove that the petition filed by Norris Grain Company, an Illinois corporation, was filed within two years after notification to such plaintiff of the alleged loss; and,

14) No evidence was offered or received which tended to prove that Norris Grain Company, a Tennessee corporation, was the first named insured under the insuring agreement.

On February 4, 1964, upon due submission, the trial court made and entered an order denying such consolidated motion for the vacation and setting aside of the verdict and judgment, or, alternatively, for a new trial, in its entirety, and in its separate demands.

Notice of Appeal herein was filed in the trial court on February 27, 1964.

In its brief filed in this court in support of its appeal, the defendant, as appellant, presents and argues only these points:

"I.

"In support of plaintiffs' claim for recovery for alleged loss due to employee dishonesty under the policy of insurance subject of this action, plaintiffs failed to introduce any direct evidence that one or more employees of plaintiffs were responsible for the alleged loss, and, in absence of such direct proof, plaintiffs further failed to fairly and reasonably exclude all other explanations for the alleged loss than that it was caused by the dishonest act or acts of an employee or employees.

"II.

"No evidence of any probative value was introduced to prove that a loss in the amount claimed was incurred by plaintiffs during the month of December, 1959.

"III.

"No evidence was presented in behalf of plaintiffs to prove that the refusal by defendant to pay plaintiffs' claim was in fact vexatious as required by the Missouri statute under which imposition of a penalty for vexatious refusal to pay is authorized.

"IV.

"The first named assured in the policy of insurance upon which plaintiffs bring this action, did not bring suit until well after the expiration of the two year limitation provided

in that policy and plaintiffs are thereby barred of recovery."

Plaintiffs, likewise, tender responsive argument upon the same points, and in like sequence.

This court has, therefore, approached its consideration of the issues before it, principally in the light of that manner of submission. It pursues that course the more readily in the persuasion that the defendant's "statement of points," supra, adequately and concisely draws to this court's attention all of the issues reflected in the record on appeal, and even those not explicitly argued questions tendered in and by the motion for vacation of Judgment and for judgment in defendant's behalf notwithstanding the verdict, or, alternatively, for a new trial, supra. However, this court's consideration of the argued points, supra, proceeds in an altered, yet logical, sequence. It deals, first, with Point IV, then with Points I and II, and, finally, with Point III, all supra.

Reverting, now, to "Schedule A" of the policy in suit already copied herein, it is recalled that the entity first named in that list of "assureds" under the policy is identified, without greater particularity, simply as "Norris Grain Company." But, during the trial and on September 23, 1963, it was stipulated in open court that "Norris Grain Company, the name in the face of this policy, the first named assured here, is the plaintiff known as Norris Grain Company, an Illinois corporation." Norris Grain Company, an Illinois corporation, at all times involved in this litigation, was the sole owner of the capital stock, both common and preferred, of Norris Grain Company, a Tennessee corporation. The corporation just named is and at least since July 20, 1955, has been a corporation organized under the laws of Tennessee; and it is, and throughout all times mentioned herein was, authorized to do business in Missouri. Also within the meaning of "all subsidiary, related or affiliated companies now owned or controlled * * * by the named assureds" as set out in Schedule A of

the policy in suit, at the time of the issuance of such policy, and at all times material herein, was a corporation existing originally under the name "Norris Grain Corporation," which was located at St. Louis, Missouri. Subsequent to its incorporation, its corporate name was changed to "Norris Grain Corporation of St. Louis, Missouri." It operated the elevator in St. Louis, Missouri, and it sustained the loss for which the claim of plaintiffs herein is made. On June 27, 1960, thus after the occurrence of the alleged loss, at a special meeting of its stockholders, by a resolution duly adopted, Norris Grain Corporation of St. Louis, Missouri, assigned all of its "debts (sic), obligations (sic), business and assets of every nature whatsoever" to "Norris Grain Company, a Tennessee Corporation;" and under date of June 30, 1960, Norris Grain Corporation of St. Louis, Missouri, as assignor, and by way of implementation of that resolution, assigned "all right, title and interest of the assignor" in and to the claim here in suit to "Norris Grain Company, a Tennessee corporation." And Norris Grain Company, a Tennessee Corporation, the assignee in and under that instrument, instituted this action in the Circuit Court of the City of St. Louis, vide supra. The action was so filed in the first instance by Norris Grain Company, a Tennessee Corporation, the corporate assignee, therefore, the sole owner, of the claim in suit, which was also a wholly owned subsidiary of Norris Grain Company, an Illinois Corporation.

It is also recognized that, by Paragraph D of the General Agreements of the policy in suit, it was provided, inter alia, and in addition to the sentence already quoted above from such Paragraph D, that:

"* * * Payment by the Company" (i. e., the defendant herein) "to the first named Assured of any loss under this Policy shall fully release the Company on account of such loss. If the first named Assured ceases for any reason to be covered under this Policy, then the

Assured next named shall thereafter be considered as the first named Assured for all the purposes of this Policy."

Norris Grain Company, an Illinois Corporation, and the Assured first named in the policy, as the record discloses, prosecuted investigation of the loss, notified defendant of the loss, and filed with the defendant a proof of loss, dated April 22, 1960.

By Section 6 of the policy's CONDITIONS AND LIMITATIONS, it is provided concerning legal proceedings under the policy, among other things, that:

"No suit to recover on account of loss under this Policy shall be brought until ninety days after proof of loss as required herein shall have been furnished, nor at all unless commenced within two years from the date upon which the loss was discovered by the Assured. If any limitation of time for notice of loss or any legal proceeding herein contained is shorter than that permitted to be fixed by agreement under any statute controlling the construction of this Policy, the shortest permissible statutory limit of time shall govern and shall supersede any condition of this Policy inconsistent therewith."

This court now turns to the consideration of item IV of the points argued in the present appeal, supra. Shortly stated, it contends for the dismissal of this action because (a) Norris Grain Company, an Illinois corporation, and "the first named assured" in the policy, did not formally become a party to this suit until March 1, 1963, thus, as the defendant contends, more than three years after the alleged loss, and (b) that date was more than two years after "the date upon which the loss was discovered by the assured." That point is premised, and, in supporting it, the defendant relies, upon both the initial sentence of paragraph D of the policy's GENERAL

AGREEMENTS, supra, and the more lately quoted excerpt from section 6 of its CONDITIONS AND LIMITATIONS, in combination, supra.

In the existing context, this court considers, as did the trial judge, that the critical language,

"No suit to recover on account of loss under this Policy shall be brought * * * at all unless commenced within two years from the date upon which the loss was discovered by the Assured,"

may not be allowed to defeat recovery herein. What the defendant seeks by the contention is not the enforcement of a legislatively erected statute of limitations, but rather the frustration of Missouri's legislatively enacted statute of limitations by the interposition of a contractual provision in derogation of it. The attempt is not well conceived. If it be granted, as, from the evidence appears to be the fact, that during December, 1959 or early in January, 1960, the corporate operator of the Norris elevator in St. Louis, Missouri became suspicious of a shortage in its inventory of soybeans, and, upon the basis of actual inventories and accounting procedures, arrived at a reasonably reliable understanding of the actual existence and the extent, of such shortage by January 31, 1960, even, in one view of the evidence by January 8, 1960, it should be held to have "discovered the loss" no later than January 31, 1960, and, as this court thinks, by January 8, 1960. Proof of loss was made by Norris Grain Company, an Illinois corporation, the "first named Assured," under date of April 25, 1960,[5] thus well within the limit therefor prescribed in the policy. That is unquestioned. The defendant conducted its own examination into the loss, to some extent before, but largely after its receipt of the proof of loss. On March 2, 1961, the defendant in writing, infra, categorically rejected the claim and denied liability therefor.

5. The evidence indicates that on that date the defendant received the proof of loss bearing date April 22, 1960, supra.

This action was instituted in the state court, supra, on December 15, 1961, by the filing therein of the Petition of the then sole plaintiff, and the issuance on that date of an original summons, of which, on December 22, 1961, service was made on the Superintendent of the Division of Insurance, Department of Business and Administration of the State of Missouri.

On the issue of the timeliness of the suit, it is at once recognized that the defendant does not—and could not with any support—assert that the action is barred by the pertinent statute of limitations of Missouri, even if the date of its effective institution be held to be March 1, 1963 when Norris Grain Company, an Illinois corporation, formally became a party plaintiff to it, rather than the much earlier date, supra, of its commencement in the Circuit Court of the City of St. Louis. Deferring briefly the question of the operative date of institution, the impact upon the case of the attempted contractual interception of a suit to recover for loss under the policy, "unless commenced within two years from the date upon which the loss was discovered by the Assured," has first consideration.

The defendant, in its attempt by that provision of the policy, to defeat recovery rests heavily upon Riddlesbarger v. Hartford Insurance Company, 74 U.S. (7 Wall.) 386, 19 L.Ed. 257, and the cases, both in the courts of the United States and in those of some of the states which have concurred in its reasoning. In the Riddlesbarger case, which arose out of the destruction by fire of an insured building located in Kansas City, Missouri, and which was instituted in a Missouri state trial court and transferred to the United States Circuit Court for the District of Missouri, the Supreme Court, speaking through Mr. Justice Field, in December, 1868, thus during the long dominance of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865,[6] in affirming the Circuit Court's judgment of dismissal upon general demurrer, declared that a condition in a policy of fire insurance that no action against the insurers for the recovery of any claim upon the policy shall be sustained unless commenced within twelve months after the loss shall have occurred, and that the lapse of such period shall be conclusive evidence against the validity of any claim asserted if an action for its enforcement be subsequently commenced, *is not against the policy of the statute of limitations, and is valid.* (emphasis added) The opinion claimed the support of cited earlier opinions by the courts of several states and at least one federal circuit court. Interestingly, the writer of the opinion, in reasoning to the ruling of his court, also declared that "the contract of insurance is a voluntary one, and the insurers have a right to designate the terms upon which they will be responsible for losses." He may, on the basis of his perspective and background, be pardoned for his formulation thereby of a declaration which intervening legal development, both legislative and judicial, has repudiated. However, the ruling was accepted and followed in many opinions and in several states. Some of those deliverances are cited in the brief here of the defendant.

■■ But, almost certainly in consequence of the Riddlesbarger opinion and its progeny, and of the aggression of the insurance enterprise and the ingenuity of its counsel, "the policy of the statute of limitations," on whose tolerance Mr. Justice Field relied, supra, historically underwent a substantial reformation, largely political and legislative, but, sub-

---

6. By that allusion, this court does not imply that the writer of the opinion in the Riddlesbarger case resorted for its support to any supposed distinction in respect of the controlling consequence, if any, of state law in federal diversity litigation, as between such law resting upon statute and that found in local judicial deliverance. What he did was rather to rest his court's ruling upon its own then and there determined generally applicable law, than to support it by local state law either of statutory or of judicial origin.

stantially also, judicial. Directly applicable here and of a pattern common to much of the change producing legislation, the legislature of Missouri in 1887 enacted a statute which, unaltered through the intervening revisions and compilations of the state's statutes, is now Section 431.030, Vernon's Annotated Missouri Statutes. Its language follows:

"All parts of any contract or agreement hereafter made or entered into which either directly or indirectly limit or tend to limit the time in which any suit or action may be instituted, shall be null and void."

The comprehensive reach of that sentence need not, probably could not, be emphasized. By the words, "any contract," it repels the supposition that it applies only to policies of insurance, yet manifestly includes them within its ambit. And it "nullifies and avoids," *all parts of any contract or agreement made and entered into after its enactment, i. e. after 1887, which either directly or indirectly limit or tend to limit the time in which any suit or action may be instituted.* Its remedial character and entitlement to liberal construction in furtherance of its manifest objective are obvious. And it has been characterized as reflective of "the public policy of Missouri," in numerous cases, of which citation may suggestively but not exhaustively be made of Karnes v. American Fire Insurance Company of Philadelphia, 144 Mo. 413, 46 S.W. 166; Cobble v. Royal Neighbors of America, 291 Mo. 125, 236 S.W. 306, 21 A.L.R. 1346 (wherein the contractual limitation attempted to erect a period of limitations longer than that of the statute); LeGrand v. Security Benefit Association (Springfield, Mo. App.) 210 Mo.App. 700, 240 S.W. 852; Brucker v. Georgia Casualty Company, 326 Mo. 856, 32 S.W.2d 1088; Asel v. Order of United Commercial Travelers, 355 Mo. 658, 197 S.W.2d 639, affirming Asel v. United Commercial Travelers of America (Kansas City, Mo. App.) 193 S.W.2d 74. To like effect, in application of the recently quoted language from the Act of 1887, but in re-

lation to a shipping contract, see Richardson v. Chicago and Alton Railway Company, 149 Mo. 311, 50 S.W. 782.

Among decisions, identically enforcing that statute, which have been made by this court or by Federal District Courts within Missouri, mention is made of Order of United Commercial Travelers v. Meinsen (8 Cir.) 131 F.2d 176, and of the ruling therein affirmed, Meinsen v. Order of United Commercial Travelers (D.C.W.D.Mo.) 43 F.Supp. 756. The writer of the opinion most recently cited was the late Judge John Caskie Collet, earlier a justice of the Supreme Court of Missouri, and, after his service as a judge of the United States District Court, a judge of this court. The following language is quoted from Order of United Commercial Travelers v. Meinsen, supra, 131 F.2d at p. 181:

"In none of the decisions of the appellate courts of Missouri relied upon by the appellant did the court cite the Karnes case, supra, or refer to the established rule in Missouri that the courts will not enforce a foreign contract if to do so would be contrary to the public policy of Missouri. The appellate courts considered only the public policy of the lex loci.

"Since it is for a state to say whether a contract contrary to such a statute as § 3351 of Missouri is so repugnant to its public policy as to require its courts to refuse to enforce it (Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, supra), the district court was required to appraise the Missouri law and determine whether there was convincing evidence that the Supreme Court of Missouri would not follow the decisions of the appellate courts but would decide differently (Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284, supra). The district court in a carefully considered opinion, after reviewing the Missouri cases, concluded that the Supreme Court of Missouri would, if the question in-

volved here were presented to it, decide according to the public policy of Missouri as declared by the legislature in the statute supra.

"We cannot say that the court erred in so holding. To reverse on this ground would require this court to say that the Supreme Court of Missouri did not mean what the plain import of its language in the Karnes case, supra, states with force and emphasis. That court said unequivocally that 'The legislature determined that a sound public policy demands that the courts of the state shall remain open to litigants as long as their claims are not barred by the statute of limitations'; that the 'legislature * * * established, as the policy of this state, a uniform regulation of the time within which suits may be brought, and declared that this should not be changed by agreement * * * and * * * it is the duty of the courts to enforce it (this rule).' There are no qualifying or limiting phrases in this pronouncement.

"The language used by the Supreme Court of Missouri in the Brucker case, supra, supports the decision of the district court with equal force. It was there said that a contract which provided that 'suit must be brought within one year * * * is in direct conflict with section 2166, Revised Statutes 1919 [now § 3351, Mo.R.S.A.], because it attempts to limit the period in which an action may be brought, contrary to our Statute of Limitations', and 'that no contract which attempts to oust the courts of jurisdiction can be enforced'; that 'a contract by the assured that any one who may acquire his rights under the contract cannot bring suit anywhere, is an attempt to oust the courts of this state of jurisdiction.' Compare Union Central Life Ins. Co. v. Spinks, 119 Ky. 261, 83 S.W. 615, 617, 84 S.W. 1160, 69 L.R.A. 264, 7 Ann.Cas. 913; Reichard v. Manhattan Life Ins. Co., 31

Mo. 518; First Nat. Bank v. White, 220 Mo. 717, 120 S.W. 36, 132 Am. St.Rep. 612, 16 Ann.Cas. 889; LeGrand v. Security Benefit Ass'n, 210 Mo.App. 700, 240 S.W. 852.

"It thus appears that the decisions of the appellate courts relied upon by the appellant are based upon a rule of comity, while the decisions of the Supreme Court relied upon by the district court are predicated upon a rule of public policy declared by the legislature and held to be binding upon the courts. The conclusion that the Supreme Court would apply this rule to a foreign contract is strengthened by its holding that an attempt to limit by contract the period in which an action may be brought is an invasion of the jurisdiction of the courts."

See also comparable discussion in Asel v. Order of United Commercial Travelers, supra, 193 S.W.2d 74 at pp. 79, 80, and Asel v. Order of United Commercial Travelers, supra, 355 Mo. 658, 197 S.W. 2d 639, point 4 at pp. 643, 645, 646.

From the opinions already cited to the instant point, as well as from numerous other Missouri authorities, it is manifest that the Supreme Court of Missouri, under the mandate of the state's cited statute (both above and next hereafter) holds that contracts repugnant to what is now Section 431.030, Vernon's Annotated Missouri Statutes, supra, are violative of the legislatively declared public policy of Missouri, and will not be enforced in and by the courts of Missouri.

For the evident purpose of obviating the consequence of those decisions, the defendant asserts in its brief before this court that the policy of insurance whereon this action is brought is an Illinois contract, that it is to be construed and applied in like manner as it would be construed and applied under the law of Illinois, that by such Illinois law the contractual limitation upon the time to institute suit, upon which it relies, is valid and enforceable, and that it should, therefore, be held to be valid and enforceable here, at least in this action.

In the first place, this court considers that the place of execution of the policy is not explicitly pleaded, and its status as an Illinois contract is not put directly in issue. It is true that the defendant is alleged to be a corporation organized under the laws of Illinois, but also authorized to do business, and doing business, in Missouri; and that Norris Grain Company, an Illinois corporation, "the first named assured," is also an Illinois corporation, authorized to do, and actually doing, business in Missouri. The copy of the policy annexed to the Amended Petition "agrees [7] with Norris Grain Company and all other assureds listed in Schedule A attached hereto and made a part hereof whose principal address is Chicago, Illinois," etc. But, even then, "Norris Grain Corporation" was a Missouri—not an Illinois—corporation and it was an Assured under the generalized description of "Assureds," already quoted herein. And it alone sustained the loss for which recovery is here sought, and after the loss sold and assigned its assets, including the claim for the loss, to Norris Grain Company, a Tennessee corporation. Thus, the loss was sustained at St. Louis, Missouri, by a Missouri assured, which shortly assigned its claim for the injury to the Tennessee corporation, which, alone, later filed the petition in this case in the Missouri state court.

 This court recognizes that, if it be granted, or determined, that allegation is made that the policy is legally "an Illinois contract," the party relying on the provision of the Illinois law need not expressly plead that Illinois law. That is particularly true in cases tried in the courts of the United States, before which no state of the United States is a "foreign state." Moreover, there appears to be no controversy between the parties but that Illinois regards as valid contractual provisions of the character here involved. On the other hand, as has already been concluded herein, Missouri, as a matter of statutory public policy, rejects such provisions as null and void.

Confronted by that aspect of Missouri's law, the defendant demands that the law of Illinois be administered in this case. A problem in conflict of laws thus confronts the court. The argument of the defendant is not persuasive. It does convincingly support the proposition that "a contractual limitation of time for bringing suit has consistently been approved by the Illinois courts." It also cites authority in support of the validity of such a provision in California, Louisiana and New York, a question not now before the court. It commends the opinion in the Riddlesbarger case, upon which, incidentally, most of the cases sustaining contractual provisions limiting the allowable time for the bringing of suit ultimately rest. As to Missouri it merely (a) reminds the court that the Riddlesbarger opinion was delivered in a suit brought upon a Missouri fire insurance policy, and (b) alludes to "a line of * * * decisions including Asel v. Order of United Commercial Travelers of America (S.Ct.1946) [355 Mo. 658], 197 S.W.2d 639, which refuse to construe a foreign insurance policy according to the law of the state in which the contract was entered into." That "line of cases," otherwise unidentified, it puts aside with this observation, "In all of these cases the decision is grounded upon a public policy to the protection of the citizens of Missouri. There is no such policy existing in the instant case, since both parties were Illinois citizens."

However, the two sentences last quoted seem to involve, first, an oversimplification, secondly, an inexact factual declaration, advanced in undoubted sincerity. While it is true that many, in fact, most, of the mentioned, though not otherwise identified, "line of * * * (Missouri) decisions" disclose the presence of an insured Missouri citizen, and such citizenship appears in some of the opinions as at least a "make weight" factor guiding the decision, that citizenship is not

---

7. "Agrees," supra, in this context means, "contracts."

the keystone of the "line of decisions." It is rather a "public policy" arising, it may be granted, out of the practice of abuse, sometimes, too, of concealment, on the part of insurers. And here it is inexact inflexibly to declare that "both parties are Illinois citizens." That is true as to the defendant and the "first named insured." It is not correctly declared in respect of the corporate assured which actually sustained the loss, or of its assignee, the initial sole plaintiff. And it is of interest, too, that the loss in suit is alleged and proved to have occurred entirely in Missouri, the corporate domicile of the entity which directly suffered that loss. If, therefore, it were true, as the defendant appears to contend that the protection of Missouri litigants and industry lies at the root of the considered hostility of Missouri's legislature and courts towards insurance policy clauses such as the one before us, then the setting of the present case would be ample warrant for the application of that policy.

Without unnecessary discussion, it is further observed that the administration by this court in the present action of Missouri's inhospitality to the contractual limitation of the time for suit is warranted, if it be not actually compelled, by the opinion of the Supreme Court of the United States in Erie Railroad Company v. Tompkins, (April 25, 1938) [8] 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and even more pointedly by the opinions of the same court concurrently delivered on June 2, 1941 in Klaxon Company v. Stentor Electric Manufacturing Company, Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 and Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481. The last two cases, amplifying and applying the Erie Railroad Company ruling, declare, as is asserted in the syllabus of the Klaxon Company case, that:

"In diversity of citizenship cases, the federal courts, when deciding questions of conflict of laws, must follow the rules prevailing in the States where they sit."

See also Guaranty Trust Company v. York (1945) 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, Pink v. A.A.A. Highway Express, (1941) 314 U.S. 201, 62 S.Ct. 241, 86 L.Ed. 152.

Mention is now made of the fact that, in support of the position respecting the policy's contractual limitation of time for suit now advanced by the defendant, reliance was placed for some years on cases of which representative citations are Tuthill v. Fidelity and Deposit Company of Maryland (Mo.App.) 119 S.W.2d 468; Roberts v. Modern Woodmen of America, 133 Mo.App. 207, 113 S.W. 726, and Dolan v. Royal Neighbors, 123 Mo. App. 147, 100 S.W. 498. That those opinions tend to support the view for which they were so cited may be granted. But it is also to be observed that, upon that precise issue, they have been held unworthy of acceptance in and by Missouri courts. Brucker v. Georgia Casualty Company, 326 Mo. 856, 32 S.W.2d 1088, and Order of United Commercial Travelers v. Meinsen (8 Cir.) 131 F.2d 176, 181, and Asel v. Order of United Commercial Travelers (Mo.App.) 193 S.W.2d 74, 80, 85 (affirmed by the Missouri Supreme Court, 355 Mo. 658, 197 S.W.2d 639).

Discussion of the policy's contractual limitation of the time for the institution of suit upon it might be extended to much greater length, and supported by far more extensive judicial authority. But it is not believed that its prolongation would serve any practical purpose. It is now simply declared that the application of such contractual limitation with the result of the defeat herein of the plaintiffs' claim would be repugnant to the public policy of Missouri as reflected in its pertinent cited statute, and judicial deliverances, supra, and must not be allowed.

But an identical conclusion is also compelled by a further facet of the defendant's argument in support of its

---

8. Approximately seventy years after the ruling in the Riddlesbarger case, supra.

point IV. In that behalf, the defendant contends, first, that Norris Grain Company, an Illinois corporation, is the "first named Assured" in the policy; and, secondly, that Norris Grain Company, an Illinois corporation, did not join as a named plaintiff in the institution of this action on December 15, 1961 in the Circuit Court of the City of St. Louis, Missouri, or at all until the filing of the Second Amended Petition on March 1, 1963, after the removal of the case to the United States District Court for the Eastern District of Missouri. Thus far, the defendant is on solid factual ground. However, it proceeds further and contends that, under the policy, Norris Grain Company, an Illinois corporation, alone, was entitled to institute such an action, and, upon that premise, all that occurred in the litigation prior to March 1, 1963, must be disregarded, and March 1, 1963 must be held to be the day on which the suit was started.

The record, however, discloses the institution of this very action on December 15, 1961 in the state court, timely service of process therein on the defendant, and its removal of the action to the federal court on January 11, 1962, and the defendant's very active participation in the case in the federal district court and this court continuously since its removal.

■ It is also proved and unquestioned that the initial sole original plaintiff in the action was Norris Grain Company, a Tennessee corporation, and that Norris Grain Company, a Tennessee corporation, through earlier assignment in writing to it from Norris Grain Corporation, the unnamed—but an actual—assured, which had sustained the loss for which suit was brought, was, at the time of the institution of the suit in the state court, the sole owner of the claim against the defendant. It was, accordingly, the "real party in interest" within the meaning of that term.

By Section 507.010, Vernon's Annotated Missouri Statutes, provision is made that:

"Every action shall be prosecuted in the name of the real party in inter-

est, but an executor, administrator, guardian, curator, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name in such representative capacity without joining with him the party for whose benefit the action is brought; and when a statute so provides, an action for the use or benefit of another shall be brought in the name of the state of Missouri."

It will be observed that the immediately foregoing section of the statutes of Missouri, with only trivial departures, is identical with Rule 17(a), Federal Rules of Civil Procedure. The rule is not now quoted, because its application is not presently and directly involved. However, occasion is taken to advert to instructive construction of provisions in it indistinguishable from language to like effect in the Missouri statute.

■ Construing and applying the recently quoted section 507.010 of the Annotated Missouri statutes, this court is of the opinion that its provision that, "Every action shall be prosecuted in the name of the real party in interest," declares the legislative will that such manner of prosecution is to be preferred in all circumstances where it is possible. What follows in the section, supra, is reflective of legislative *permissive allowance* of prosecution by another, or by others, than the real party in interest in circumstances which render prosecution by the real party in interest either impossible or palpably inconvenient or impracticable. But nowhere, and by no language, does the permissive verbiage of the section proceed beyond *permission*, or bar the real party in interest from instituting or prosecuting an action upon a claim of which he is the actual owner. It is, therefore, believed that, except as is provided in the concluding twenty-six words of the section, which are mandatory, one who is the real party in interest in respect of a claim has the unchallengeable right personally, and in his name,

to institute and prosecute a suit to recover upon such claim, even in those instances in which someone else in a representative or fiduciary capacity *may proceed* for either the disclosed or the undisclosed benefit of the real party in interest. And let it be remembered that the sole and unrestricted assignee of an entire claim of the present character, upon his receipt of the assignment becomes as to the assigned claim, the real party in interest, and, in that right, entitled to institute suit upon the claim. Guerney v. Moore, 131 Mo. 650, 32 S.W. 1132; Roth v. Continental Wire Company, 94 Mo.App. 236, 68 S.W. 594; Milliken-Helm Commission Company v. C. H. Albers Commission Company, 244 Mo. 38, 147 S.W. 1065; Bullock v. E. B. Gee Land Company, 347 Mo. 721, 148 S.W.2d 565; Rosecrans v. William S. Lozier, Inc. (8 Cir.) 142 F.2d 118, 124; Prudential Insurance Company of America v. Bohlken (D.C.Mo.) 40 F.Supp. 494.

Though admittedly in a context somewhat different from the present one, the basic issues now under consideration were discussed by the Supreme Court of Missouri in Brucker v. Georgia Casualty Company, 326 Mo. 856, 32 S.W.2d 1088. At page 1091 of that opinion, the court, in language which both disclosed its setting and declared the Supreme Court's position touching the position now taken by the defendant, said:

"There is another reason why the garnishment proceeding in this case is sound. Condition D in the policy provides that no action shall be brought except in the name of the assured after final judgment and after the assured has paid the judgment, and the suit must be brought within one year. That is in direct conflict with section 2166,[9] Revised Statutes 1919, because it attempts to limit the period in which an action may be brought, contrary to our Statute of Limitations (Rev.St.1919, § 1316). If the assured should assign his claim, the assignee could not sue on it, although he paid full value for it and his title were perfect; the assured could not sue on it because under section 1155, Revised Statutes, 1919, every suit must be brought in the name of the real party in interest. In that case to enforce a perfect right, nobody could sue.

"If the assured should die before his claim for loss were paid, his administrator or executor could not sue for this just debt due the decedent's estate, nor could a purchaser at an administrator's sale. Thus the no-action clause attempts to say that certain persons who have perfect causes of action can not sue in the courts to enforce them.

"This is contrary to the principle that no contract which attempts to oust the courts of jurisdiction can be enforced."

In New Amsterdam Casualty Company v. W. D. Felder and Company (5 Cir.) 214 F.2d 825, 826, an action which arose in the Northern District of Texas, the court was confronted with a claim comparable to the one now before this court, and with a defense which appears to be indistinguishable from the contention of the present defendant to the effect that the "first named insured" had the right to sue—to the exclusion of an insured under the policy there in suit, not the "first named insured" under the policy, but the insured which sustained the loss and brought the suit. The Court of Appeals, in affirming a judgment of the District Court without a jury, rejected that position, and, among other things, said:

"[1] (1) It is contended the trial court erred in ruling that plaintiff, who is not the first named assured in the bond sued upon, had the right to maintain the action because of provisions in the bond to that effect.

9. It is to be understood that section 2166, R.S.1919 is the identical provision which is now section 431.030, Vernon's Annotated Missouri Statutes, already cited and discussed herein.

Rule 17(a), Federal Rules of Civil Procedure, 28 U.S.C.A., provides that 'Every action shall be prosecuted in the name of the real party in interest', subject to certain exceptions not pertinent here. Appellee suggests that the purpose of inserting the above provision in the bond might have been for the convenience of insurer in connection with collection of premiums and mailing of notices and that it was not inserted for the purpose of burdening the first named insured with the duty of prosecuting all claims in behalf of the other insureds. Whatever might have been the purpose of inserting that clause in the bond, we are clear in our opinion that under the facts of this case this insured was entitled to maintain this action and that no rights of the defendant or of the first named assured in the bond are jeopardized thereby."

It is true that the appellate court there administered Rule 17(a), Federal Rules of Civil Procedure. But that circumstance does not rob the foregoing ruling of significance here, where the statutory prescription touching the right of the real party in interest to prosecute a suit is indistinguishable from—in fact, essentially identical with—such Rule 17(a), supra.

Without further discussion this court rejects both of the contentions of the defendant that suit for recovery on the present policy had necessarily to be instituted by Norris Grain Company, an Illinois corporation, and that the policy's contractual limitation of the time for the institution of suit to recover any loss under it, contained in section 6 of "conditions and limitations," already quoted herein, is valid and enforceable. It holds directly to the contrary of both and each of those contentions. It, therefore, concludes that this suit was timely brought, primarily upon the premise that the period of limitations is to be determined not by private contract but by the statute of Missouri.

As will have been understood, this court arrives at the conclusion just signified, first, and sufficiently, in the conviction that the suit was timely brought under Missouri's law, even if March 1, 1963 were accepted as the date of its institution, and, secondly, because it was actually instituted on December 15, 1961, unquestionably within both the statutory period and also within the attempted but inoperative contractual period.

It may be made perfectly clear that this court's determination upon December 15, 1961 as the date of institution of this suit rests primarily upon the proposition—already too frequently asserted herein—that, as the real party in interest, Norris Grain Company, a Tennessee corporation, had the right to—and did then—institute it. Its status and resulting right to sue will not be further supported by authority. What is additionally offered in support of that date of institution is probably supererogatory. It is not, on that account, without significance.

The defendant is understood to argue that the filing of suit by Norris Grain Company, a Tennessee corporation, does not rise above the status of a nullity. It did not so deal with the suit by that filing initiated. It procured its removal to the United States District Court, and, thereafter, through the remainder of 1962 and during the first two months of 1963, while consistently presenting the issues yet insisted upon in its argument upon Point IV, proceeded in the general direction of the determination of a litigated action. Then, the Second Amended Petition was filed, in which Norris Grain Company, an Illinois corporation, joined as a plaintiff. Apart from the addition of that plaintiff, the claim stated against the defendant remained essentially unchanged.[10] From its inception it had been, and, after the filing of the Second Amended Petition, it remained, a suit

---

10. Saying which, this court does not signify its entertainment of the impression that the appearance of an additional plaintiff made no change in the suit.

for the recovery of the alleged loss for the use and benefit of Norris Grain Company, a Tennessee corporation, the owner of the claim through the assignment of such claim, supra. That corporation has had the prime stake in the suit since it was started, and still has it. Surely, its formal appearance on March 1, 1963, as one of two plaintiffs was not the institution of a new suit. It is, incidentally, observed that Norris Grain Corporation of St. Louis, Missouri, no longer exists.

In a somewhat similar, though not identical, case the Supreme Court of Missouri, in Lilly v. Tobbein, 103 Mo. 477, 15 S.W. 618, 620, 621, said:

"It is doubtless true, as many of the authorities cited hold, that an amendment bringing in a new party defendant will not relate back so as to prevent the bar of the statute as to the new party defendant; but there is a vast difference between substituting a competent for an incompetent plaintiff, and bringing in a new defendant. Substituting the party having the legal right to sue for the claim for which the action was brought instead of another party improperly named as plaintiff is not the commencement of a new action, and in such a case the amendment relates back to the commencement of the action. [United States] Insurance Co. v. Ludwig, 108 Ill. 514. Now, in the present case there has been no change in the cause of action itself. The subject-matter of the suit and the issues to be tried were the same after as before the amendment. So far as the defendants are concerned, this suit was commenced when process was served upon them. The suit has been, from first to last, prosecuted in the interest of the church, and we entertain no doubt but the amendment substituting the individual plaintiffs for the unincorporated association related back to the commencement of the suit, and the statute of limitation was arrested at that time."

See also Turner v. Noble, 211 Mo.App. 656, 249 S.W. 103; Maddux v. Gardner, 239 Mo.App. 289, 192 S.W.2d 14; and Hackett v. Van Frank, 119 Mo.App. 648, 96 S.W. 247, in relation to the liberal allowance by the courts of Missouri of leave to amend in furtherance of justice and application of the rule regarding "relation back."

This court, without more, rejects the defendant's argument upon its Point IV and, in respect of that point, agrees with the plaintiffs.

Points I and II are next encountered. It is believed that their consideration may be reflected briefly, despite their central inportance in the litigation.

■ The defendant's statement of, and argument upon, its Point I opens with the assertion that "plaintiffs failed to introduce any *direct evidence that one or more employees of plaintiffs were responsible for the alleged loss,*" (emphasis added). The sufficient answer to that assertion is that the production of such *direct* evidence was wholly unnecessary. Without repetitious quotation, it is noted that, by "Insuring Agreement I," supra, the defendant insured each and all of the "Assureds" against loss caused by the fraud or dishonesty of any one or more of the employees of the Assureds, whether the offending employee or employees be identifiable or unidentifiable, with the provision, among others, that if "the Assured shall be unable to designate the employee or employees causing such loss, the Assured shall nonetheless have the benefit of this Insuring Agreement I, *provided that the evidence submitted reasonably (in case of inventory shortage, conclusively), establishes that the loss was in fact due to the fraud or dishonesty of one or more of the said employees,*" (emphasis added). The loss presently involved arose out of an inventory shortage, infra, and the assured victim of the loss and its assignee, now a plaintiff herein, were and are unable to identify or designate the employee or employees wrongfully causing it. Therefore, the plaintiffs in order to recover for such loss through

inventory shortage, were required to adduce evidence which was sufficient to establish the loss, and further to establish conclusively that the loss was in fact due to the fraud or dishonesty of one or more of the employees of the loss sustaining Assured. It was not and is not required that such proof be made by "direct" evidence. Indirect, or circumstantial, evidence suffices, if it be adequate to establish conclusively that the loss occurred and was in fact due to the fraud or dishonesty of one or more of the employees of the losing Assured. And in its form, that evidence may be, and frequently is, negative.

Upon the trial, proof was made, partly by stipulation, partly by evidence and testimony, that at all time material herein Norris Grain Corporation, a Missouri corporation, was a subsidiary of the named Assureds, and, therefore, itself an Assured under the policy in suit; that at such time it operated in St. Louis, Missouri, a very large grain elevator, with and through which, it conducted an extensive business consisting of the purchase, storage and sale of various grains, including soybeans;[11] that in such operation, Norris Grain Corporation purchased, received in the elevator, and sold soybeans in quantity extending into many thousands of bushels; that it took delivery of soybeans sold to it, to some extent by river barge or railroad car shipments, but much more frequently from motor trucks operated, by or for selling customers, upon highways for vehicular traffic leading to its St. Louis elevator from many widely separated points in the St. Louis trade territory.

Proof was made of the procedures followed, especially in the reception of, and compensation for, soybeans purchased and delivered at the elevator; and that proof included the description, aided by photographic representations, of the portion of the elevator involved in that operation, and the generalized identification in respect of their stations and duties, of employees participating in such reception. That portion of the elevator was an enclosed area leading from a door providing entrance from the out of doors into the elevator. The loaded motor trucks were driven by their operators [12] from the out of doors into that enclosed area and brought to a halt, sometimes at the termination of the initial entrance movement, at other times by later adjusting movement, with wheels upon the level of the area's floor, with a view to their further operation, infra, including preliminary identification and inspection procedures, and extending to later positioning on the scales for weighing, and for the dumping of the loads.

Within that area, as extended and at successive places, were stationed the employees of the Assured engaged in the identification and testing of, and preparation of the record concerning, each truck load of soybeans so purchased and received, all involved in the computation of the purchase prices of the loads, as well as in the final unloading, of the cargoes themselves. Those employees included, among others:

a) a "sampler," who, upon the arrival and stopping of a truck loaded with soybeans, would, first, direct the driver to remove from the top of the truck, at least to roll back, the protective tarpaulin covering of the truck and of its cargo, or on some occasions would himself remove or roll back that tarpaulin, then personally mount the truck, and, thus positioned, and by means of a probing device, remove from the cargo, several differently located small specimens of the soybeans, which he placed in a "sample bag" along with a "pan ticket" or "sample ticket" of his own preparation, upon which he had written the name and address of the owner or driver, and the

11. Soybeans constitute the only grain involved in this case.

12. Who were almost exclusively selling customers or their employees, or the drivers of commercial trucks procured by such customers for the hauling to market of soybeans grown, or otherwise theretofore acquired, by such customers.

registration number, of the truck, after himself obtaining such information, the registration number by his own personal scrutiny, all of which (with the other mentioned items contained in the sample bag) he manually delivered to the inspector, *vide infra;*

b) an "inspector," who endorsed on a scale ticket form the information then appearing on the "sample ticket" thus delivered to him, and "graded" the soybean cargo; identified its content of moisture and its temperature, foreign material of any character, damage to the grain of any character, (but including broken kernels), and "test weight" for the "grading" of the tendered product; made a proper record of such inspection, including grading; entered much of the inspection information and data from the "pan ticket" on the "scale ticket," and personally gave the "scale ticket" to the driver of the truck; [13]

c) the "weigher," who, in a "scale room," with full observation of the truck, its cargo and its driver, performed the weighing operation briefly explained in the next ensuing paragraph, and also the dumping of the cargo.

Upon the delivery of the "scale ticket" to the driver, the driver operated the loaded truck forward, and, it seems, with some elevation to a surface upon which were located the truck scale and the truck dump, and there positioned and immobilized the loaded truck. He promptly took the scale ticket to the weigher on the scale, and gave the ticket to the weigher. The weigher moved a scale control knob and lever with the effect of adjusting the scale into a weighing position, and weighed the truck and its load, without the driver, to obtain the gross weight, and the gross weight was recorded on the "scale ticket," infra. The weigher then dumped the contents of the truck by mechanically elevating the front end of the platform with the rear, and, at that time, the lower end of the truck opened for the release of the cargo. The empty truck was restored to its normal level position, and without its driver, weighed by the weigher to obtain the tare weight, which was also recorded by the weigher on the "scale ticket," infra. The recording of the gross and tare weights was mechanically accomplished by their stamping in typed characters, the latter below the former, on the scale ticket inserted in a slot in the scale designed for that purpose. The weigher then determined the net weight of the soybeans by subtracting the tare weight from the gross weight. He then completed the scale ticket by entering upon it the net weight of the cargo. Scale tickets were prepared in triplicate. The weigher, on completing the scale ticket, would give the driver one copy—usually the third—of the scale ticket. The other two copies of the scale ticket he would deliver to the elevator office on an occasion early thereafter, sometimes by a personal trip to the elevator office, at other times, through messengers sent from the office to obtain them.

The driver, upon the completion of the weighing and unloading operation, and his receipt of one copy of the "scale ticket", which, by that time, disclosed the registered number of the truck, the identity of its driver, the kind of commodity constituting its cargo, the grading notations, supra, the weights, with the computation of the net weight, and other miscellaneous notations, drove the empty truck off the platform and went to the office where he generally delivered his copy

13. The record appears to present some uncertainty whether the "grading" was done by the inspector or by an additional employee referred to as a "grader." The doubt is not regarded as significant. If the latter supposition be correct, it would operate to introduce an additional employee into the critical area of the elevator. However, this court understands the whole record rather to support the view that there was only one such employee, and that the inspector did the grading.

of the "scale ticket".[14] Evidence received upon the trial supports the view that, during the entire elevation of the front end of the truck, the opening of its rear end, and the dumping of its cargo, the weigher remained at or near the rear end of the truck, and, with the driver, the truck itself and the descending cargo while it was being dumped were within his personal observation. From the foregoing procedural course, this variation is to be noted Some trucks, by means of which soybeans were brought to the elevator, were equipped with self powered unloading devices. Ordinarily, but not invariably, the cargoes of those trucks were dumped by the application of their own power, rather than by the slanting elevation of the front end of the elevator's platform. The soybeans, when and however dumped from a truck were introduced directly through the dumping process into a hopper beneath, and in the rear of, the platform, the weigher being present.

The soybeans thus delivered by motor trucks, and, by dumping, placed in the hopper, (which had a capacity of approximately 500 bushels) were, mechanically, and by means of a "leg," i. e. a belt with attached buckets, taken from the hopper and lifted to the elevator's ninth floor, whence they were diverted to, and moved upon, a rubber coated conveyor belt to the proper point on that level, from which they were again diverted to and upon another, and similar, conveyor belt, and on and by it carried to an appropriate point above one of the storage bins or tanks, into which they were to be placed, and were then deposited in that bin for storage while they should remain in the elevator.

Mention has already been made of the fact that the corporate operator of the elevator, in addition to its acquisition of soybeans delivered by trucks, also received delivery of other soybeans through shipments thereof to it both by barges and by railroad freight cars. Soybeans delivered by each of those carriage methods were, by employees of the corporate operator of the elevator, weighed in large quantities within the elevator, after their delivery and unloading, by weighing devices different from, and unconnected with the scales for the weighing of soybeans delivered by motor trucks, and the records of those large weighings were preserved. However, in the overall dealings of the corporate operator of the elevator in soybeans, and in its inventories of, and accounting by records for, soybeans, consideration was taken of all of its soybeans, irrespective of the manner of their transportation to the elevator.

An explanatory note is in order at this point. It will have been observed that, thus far herein, the factual discussion has been oriented to the operations of the Assureds (including purchase, storage, and only incidentally, sale) in soybeans alone. That will continue largely to be true hereafter. Yet, it is to be understood that the Assureds also dealt at the St. Louis, Missouri, elevator in other grains. In fact, a problem arising in part out of the storage of grains other than soybeans complicated and magnified for the Assureds the crisis which is now mentioned. Notwithstanding which, it is to be remembered that this suit has wholly to do with a claim rooted in the operations in soybeans.

About the first of December, 1959, a fire occurred at the St. Louis elevator, and particularly in the elevator's grain

---

14. On occasion, though infrequently, one man, as the owner or other deliverer, of all of the grain delivered in several trucks arriving together, received the "owner's copies" of all of the scale tickets for those trucks. But generally, trucks arrived and were processed individually, and not in a group. Payment for the soybeans was made upon the basis of the information disclosed upon the completed "scale tickets" duly verified by reference to the weigher's retained copies. Generally such payment was made by the purchasing operator of the elevator through prompt transmittal by mail; but, on some occasions and at the seller's request, it might be, and was, made immediately following delivery, by handing it to the driver.

dryer. It resulted in such damage to the dryer that that equipment was rendered inoperable, and had to be repaired as early as was possible. Such haste was imperative because the elevator contained large quantities of grains with high moisture ingredients. That was notably true of corn, of which the harvesting season was barely—even not completely—terminated. "Wet" grain is notoriously vulnerable to "heating;" and "heating" both induces destructive spoilage of the grain, and presents a serious threat of the consumption by fire of the storage facility, along with the commodities stored within it.

Under the compulsion of the emergency of that repair, the elevator's managing personnel, so far as was possible, accorded to it priority in the assignment to work of the elevator's employees. The repair effort continued generally through the month of December, 1959. During its progress, in addition to its regularly employed maintenance force, which, not clearly identified, was almost certainly small, the operator of the elevator assigned many of its employees normally working in various other departments, including those working in the reception into the elevator of purchased soybeans, supra, to duty in the emergency repair of the dryer. In fact, the elevator superintendent and assistant superintendent, both of whom ordinarily maintained a close observation of the plant's entire operations, including those in the grain receiving area, supra, during the repair interval both "worked night and day up in the house on the dryer," that is to say, several stories above the location of the stations for the reception and dumping of soybeans. That confining and restricting preemption of their services necessarily impaired, while it continued, their direct observation and supervision of the employees in the soybean receiving area of the elevator. During that emergency also, employees normally assigned to other duties, and at other places in the elevator, were required frequently to perform tasks that were within the day by day performance of one or more of the sampler, the inspector-grader, and the weigher. In other words, the usual routine working assignment or schedule of the elevator was measurably disturbed. Yet, the commercial operations at the place of business were persisted in, even if under difficulties.

At almost the same time, and effective during much of December, 1959, another and somewhat bizarre, occurrence was observed, but appears to have been analyzed only after it had persisted for an inexactly established interval. One Huie Krana, whose address was Davenport, Iowa, sold and delivered soybeans to Norris Grain Corporation at the Norris elevator in St. Louis, and delivered them in motor trucks. It is impossible from the record to determine exactly when he initiated such sales and deliveries, but the evidence tends to support some time early in December, 1959 as such date. His manner of delivery was unique. He seldom, if ever, brought in a single load. He did not himself operate any delivering truck. Instead, he drove a personal passenger vehicle, and in it arrived at the Norris elevator in St. Louis, with noticeable consistency, only a few minutes before the arrival of the soybean laden trucks whose cargoes he presented for sale. Those trucks did not arrive singly but came in a group, and, as was observed, in such proximity to each other as to indicate a concerted objective of proceeding into the elevator as a single unit, one truck immediately following another in line. Their number in the line at a single appearance was generally five or six, sometimes more. Thus concurrently approaching the delivery section of the elevator, they were almost, though not quite, invariably processed therein in unbroken sequence.[15] Two other men identified on the trial by names, were also participants along with Krana in some of those deliveries. But from the record, the writer of this opinion has been unable to identify the number of the trips in which

15. The serial numbers on their "truck tickets" in evidence supports oral evidence to that effect with only slight variation.

either, or both, of them participated. Of course, every truck was operated to and in the elevator by its own driver. Krana regularly remained through the weighing and dumping operations involving the trucks with which for that transaction he was associated, and received the completed "truck-tickets" for all of them. Those tickets he promptly took to the elevator office, and at once collected the sale price for all of the loads. He did this pursuant to an arrangement, to which someone in the elevator's operation had agreed at Krana's request.

The evidence discloses that Krana had a record of earlier criminal prosecution. And, at one juncture in the trial, it was declared that he was, during the trial, an inmate in a penitentiary in a distant state; and at another point in the trial, under cross-examination in behalf of defendant, on September 18, 1963, a witness testified that "the Krana outfit" had inflicted a loss in "a large amount," by means of "manipulation of the scale beam," as he understood, upon another identified grain corporation.

To come to the core of this litigation, there was, before the trial court, much evidence to the effect that in the winter of 1959–1960, Norris Grain Corporation of St. Louis, Missouri, in its St. Louis elevator operations, was prompted to suspect the existence of a shortage in its actual inventory on hand of soybeans, as compared with its supposedly stored supply of that commodity, and after proper accounting reconciliation in the light of operating fluctuations, it verified the existence of that shortage, and determined its quantity to be 41,216 bushels, whose value the plaintiffs alleged, and fortified with supportive proof, to be $85,800.00.[16] Evidence in behalf of plaintiffs supports the position that the suspicion of the existence of a shortage arose in the middle or latter part of December, 1959, but a witness for defendant advances the position that it may have arisen even earlier in that month, and after the inexactly identified time when the conclu-

sion from a bin sounding estimate of stored soybeans was made, infra. The plaintiffs tendered evidence from several witnesses, adequate to sustain the occurrence of that loss, and its amount. The defendant, in pleading, denied both the fact, and the extent of the loss, and also the plaintiffs' allegation respecting the interval of time within which the shortage, if any, occurred. But upon the trial the defendant, while persisting in its denial, did not support it by evidence which could be adequate, seriously to dispute the actuality or the magnitude of the shortage as such. But if, in the face of plaintiffs' persuasive testimony upon that facet of the case, it be considered that the evidence for the defendant made a litigable issue upon it, then it must be concluded that the jury's verdict resolved that issue in plaintiffs' favor, infra.

The defendant contended more seriously at the trial, and before this court has argued the question more vigorously, that the calendar interval of the month of December, 1959, alleged by the plaintiffs, and denied by the defendant, as the time of the loss was not proved by the plaintiffs. In that behalf also, so far as the point is significant, the verdict of the jury is decisive, infra.

The testimony and exhibits received upon the trial in the District Court provide the evidentiary support for the factual background of the present litigation thus far set out herein. There is actually only inconsiderable dispute concerning that segment of the case. Much of the historical aspect of the claim in suit, in so far as it has already been recalled, is either admitted or made the subject of denial, which is not buttressed by supporting evidence, calculated squarely or convincingly to repel the plaintiffs' reflection of the setting and circumstances out of which this claim arose.

The course pursued by the parties in the formulation by their pleadings of the issues in the action has already been set out, as has also been the exact lan-

16. The jury, upon the trial, found that value to be $83,998.00, supra.

guage of the jury's verdict. It appears to be in order to recall, at this juncture, the portions of the charge to the jury directly pertinent to Points I and II of the questions argued to this court in behalf of the defendant, supra. The essential features of the charge, slightly rearranged but verbally unaltered, are now reflected in what is believed to be a readily intelligible and logical sequence.

Dealing with the policy's requirement that to support a recovery under it by an Assured (and, therefore, by an assignee of an Assured), the evidence prove conclusively that the loss by way of an "inventory shortage" was in fact due to the fraud or dishonesty of one or more of the Assureds' employees, the court said:

"The court instructs the jury that it is the law that, while the fact that shortages were caused by the dishonesty of plaintiffs' employee or employees may be established by circumstantial evidence, the evidence to establish that fact must be of such a nature that it is the only conclusion that can fairly or reasonably be drawn, that is to say, such evidence must fairly and reasonably exclude any other explanation.

"In this connection the court further instructs you that if you find and believe from the evidence that said evidence is as consistent with the view that the loss, if you find and believe from the evidence Norris Grain Corporation did suffer a loss, resulted from fraudulent or dishonest act or acts of identifiable or unidentifiable employee or employees of Norris Grain Corporation as with the view that said loss resulted from any cause other than the fraudulent or dishonest act or acts of such employee or employees, then your verdict shall be for defendant, Lumbermens Mutual Casualty Company, and against plaintiffs, Norris Grain Company, a Tennessee corporation, and Norris Grain Company, an Illinois corporation."

Premised by the immediately foregoing excerpt from the charge, and with orientation to the elements essential to recovery under the policy, and to the measure of damages, the court further declared:

"The Court instructs the jury that if you find and believe from the evidence that plaintiff, Norris Grain Company is an Illinois Corporation, and co-plaintiff Norris Grain Company is a Tennessee Corporation; that said corporations are in good standing and are assureds under a policy of fidelity insurance issued by defendant on December 15, 1956; that Norris Grain Corporation was a subsidiary, related and affiliated company controlled by plaintiff Illinois Corporation as a named assured under said policy; that plaintiffs hold title to all claims or assets formerly possessed by Norris Grain Corporation arising from its loss, if any, claimed to be covered under the provisions of said policy; that during December 1959, Norris Grain Corporation suffered a monetary loss of the value of forty-one thousand two hundred sixteen (41,216) bushels of soy beans by reason of the fraud and dishonesty of one or more of its employees identifiable or unidentifiable acting alone or in collusion with others, in the receiving of soy beans at its grain elevator in St. Louis, Missouri, and the false recording of said receipts for the purpose of authorizing and causing improper and excessive payments by Norris Grain Corporation to those from whom said employee or employees falsely reported said receipts; that Norris Grain Corporation notified defendant of such loss and filed proof of loss with defendant; that plaintiffs, Norris Grain Corporation, all named assureds, and all subsidiaries or affiliated companies complied with all conditions of the policy aforesaid with reference to the claim herein under the policy issued by defendant; that plaintiffs and Norris Grain Corporation demanded payment from defendant of the loss claimed herein;

that all premiums due under said policy were paid; and that defendant refused to pay Norris Grain Corporation or plaintiffs for the monetary loss claimed by plaintiffs and by Norris Grain Corporation under the policy issued by defendant, herein, then your verdict shall be in favor of the plaintiffs and against defendant for the amount of the loss, if any, reasonably due in fact to the fraud or dishonesty of one or more of the identifiable or unidentifiable employees of Norris Grain Corporation, not to exceed, however, the sum of Eighty-Three Thousand Eight Hundred Ninety-Eight Dollars ($83,898.00)."

And in the following two paragraphs, the court briefly recalled the elements of the claim essential to recovery, and, thereupon, instructed thus respecting the burden of proof:

"The Court instructs the jury that plaintiffs in this case allege and submit (1) that Norris Grain Corporation suffered a loss of 41,216 bushels of soybeans; (2) that such loss occurred during the period December 1, 1959 through December 31, 1959, (3) that said loss was caused by fraudulent or dishonest act or acts of unidentifiable employee or employees of Norris Grain Corporation acting alone or in collusion with others, in the receiving of soybeans at its facility, at 4800 North Wharf, St. Louis, Missouri, and the false recording of said receipts for the purpose of authorizing and causing improper and excessive payments by Norris Grain Corporation to those from whom said employee or employees falsely reported the receipts aforesaid.

"And you are further instructed that under the law the burden of proof on the above issues rests upon plaintiffs and this burden of proof on the above issues continues and abides with them throughout the trial, and requires them to establish the truth of each of the charges as laid to the reasonable satisfaction of the jury by the greater weight of all the credible evidence in the case, and if they have not so discharged this burden of proof so resting upon them, and if upon the whole case you find the evidence touching the above issues does not preponderate in favor of plaintiffs, then your verdict must be for defendant and against plaintiffs."

With special reference to Point III of the defendant's points for argument, involving the assessment of damages and costs for the insurer's allegedly vexatious delay in payment, the court charged the jury in this manner:

"The Court instructs the jury that if you find for plaintiffs on the policy; and if you further find that the defendant, under the provisions of the policy, agreed to pay plaintiffs or either of them or Norris Grain Corporation for any loss caused by the fraud or dishonesty of any one or more of the employees of Norris Grain Corporation, even though Norris Grain Corporation should be unable to designate the specific employee or employees causing such loss, provided the evidence submitted to defendant reasonably established that the loss was in fact due to the fraud or dishonesty of one or more of the said employees, within the limit of liability of Five Hundred Thousand Dollars ($500,000.00) applicable under the policy to such agreement; and if you further find that the defendant has refused to pay the loss of plaintiffs and Norris Grain Corporation, if any; and if you find that such refusal was willful and without reasonable cause, as the facts appeared to a reasonable and prudent man before the filing of this suit, then you may, in addition to the amount due on the policy, allow plaintiffs damages not exceeding ten percent (10%) on the amount of the loss and a reasonable attorney's fee."

Consideration of the last quoted paragraph of the charge is deferred pending

the completion of brief discussion of this court's conclusions as to defendant's Points I and II, and arrival at Point III.

Concerning that charge this should be said. Aside from the defendant's contention of the insufficiency of the evidence to warrant the submission of the case to the jury, supra *et* infra, no issue is tendered to this court over the essential correctness of the charge. Upon the trial no exception to it, or to any aspect of it, was taken or preserved. Finally, it is well considered and correct. It is commendably concise and simple. By it the trial judge reflected in readily intelligible language the few words or phrases of the policy that naturally suggested their own clarification. It faithfully discloses to the jury the considerations which should guide them in their evaluation of the evidence and in their arrival at their verdict. And that is the proper ministry of a charge to a jury in a United States District Court.

What the defendant appears principally to contend is that the evidence in the action was not, and is not, sufficient to justify the commitment of the case to the jury, or to support a verdict in it against the defendant.

With such brevity as may be attained, it is by this court, and from the record here, concluded that there was before the trial court evidence, appraised in the light of the pleadings, adequate to sustain findings that, at all material times, plaintiff, Norris Grain Company, an Illinois corporation, was, and that it now [17] is, a corporation organized under the laws of Illinois, and licensed to do, and actually doing, business in Missouri; that plaintiff, Norris Grain Company, a Tennessee corporation, was, and that it now is, a corporation organized under the laws of Tennessee, and licensed to do, and actually doing, business in Missouri; that prior to and on December 15, 1956, and at all times thereafter which are material herein, Norris Grain Corporation (after an

imprecisely identified date in June, 1960, by amendment of its articles of incorporation, Norris Grain Corporation of St. Louis, Missouri, but hereinafter generally identified as Norris Grain Corporation) was a corporation organized and existing under the laws of Missouri, and engaged in business, *vide* supra, in St. Louis, Missouri at and in the large grain elevator already identified herein; that at some time not exactly identified, but on or after June 30, 1960, Norris Grain Corporation ceased to retain its corporate existence and is not presently an existing corporation; that Norris Grain Corporation was a subsidiary, related and affiliated corporation controlled by plaintiff, Norris Grain Company, an Illinois corporation; that each of the two plaintiff corporations, at all times material herein, were and are in good standing, and, together with Norris Grain Corporation, both of the plaintiffs at all times material herein were, and they are, assureds under Policy No. F 54-200 (and the later policy in extension thereof) issued and delivered as of December 15, 1956 by the defendant to Norris Grain Company, an Illinois corporation, and others, all as is hereinbefore found and announced; that such policy, as extended, contained and contains the several insurance agreements and conditions and provisions already mentioned, disclosed and discussed herein; that by virtue of the resolution, at special meeting held on June 27, 1960, of the stockholders of "Norris Grain Corporation of St. Louis, Missouri" and of the assignment of claim on June 30, 1960 by "Norris Grain Corporation of St. Louis, Missouri" to Norris Grain Company, a Tennessee corporation, *vide* supra, plaintiff Norris Grain Company, a Tennessee corporation, since June 27, 1960 (certainly since June 30, 1960) has been, and at the time of the institution of this action was, and now is the holder of title to all claims or assets formerly owned or possessed—

17. In the present context, and in comparable contexts, later herein the word "now" is and will be used with special relation to the time of the trial of this action in the District Court, and to the date on which the court's charge was imparted, the jury's verdict was returned, and judgment was made and given.

or owned and possessed—by Norris Grain Corporation, arising from its loss claimed to be covered under the provisions of such insurance policy (as extended); that during December, 1959, Norris Grain Corporation sustained and suffered in its business operations at its St. Louis, Missouri elevator, a loss, in the way of an inventory shortage, of forty-one thousand, two hundred sixteen (41,-216) bushels of soybeans; that plaintiff, Norris Grain Company, an Illinois corporation, notified the defendant of such loss and filed proof of loss with the defendant; that plaintiff Norris Grain Company, an Illinois corporation, and its co-assureds complied with all conditions of the policy with reference to the claim herein under the policy, particularly by full cooperation with the defendant in its investigation of the loss and the claim therefor; that all premiums due under the policy were paid; that plaintiffs and Norris Grain Corporation demanded from the defendant payment of the loss claimed; that the defendant refused to pay the claim by letter on its stationery, addressed to Norris Grain Company, an Illinois corporation, for the attention of its named secretary, in the following language:

"Dear Sir:

"We have taken counsel on this claim. Our attorneys have given careful consideration to all of the facts developed during the course of our investigation of the claim. It is their opinion that the evidence submitted does not justify a payment of the claim. In making this reply to your letter of January 25, 1961, please be informed that we again reserve all of our rights and defenses and waive none."

that the immediately foregoing letter bore date, and was transmitted on, March 2, 1961, and was written and transmitted in behalf of the defendant after the defendant had, with the full cooperation of the plaintiffs and Norris Grain Corporation, conducted an investigation of the claim, and thereby been made aware of the facts and probable evidence herein, and was signed with full authority in behalf of the defendant by R. J. Supernaw of its Bond Claim Department; and that the loss in terms of money was and is the sum of $83,998.00.[18]

■ There was also before the trial court evidence, partly direct, partly circumstantial, and in a limited measure negative in the manner of its expression, adequate to sustain a finding by the jury that such inventory shortage and resulting monetary loss was by the evidence conclusively established to have been due to the fraud or dishonesty, or both, of one or more of the employees of Norris Grain Corporation, identifiable or unidentifiable—rather more persuasively unidentifiable, except as to classification of employment—acting alone or in collusion with others—again, more convincingly, with others—in the receiving of soybeans in its grain elevator in St. Louis, Missouri, and the false recording of said receipts for the purpose, and with the effect, of causing improper and excessive payments by Norris Grain Corporation to those from whom said employee or employees falsely reported such receipts.[19]

■ Only a portion of such evidence may appropriately be mentioned; and even it may not be exhaustively reflected or analyzed. Space compels that restraint. Reference is now made, without

18. That figure is employed here in full awareness of the trial judge's mention in his charge of a sum, which is, in the circumstances, slightly smaller. It is also the figure contained in the verdict. We do not understand that corrective diminution of the judgment on the score of that relatively minor disparity is sought.

19. It will have been observed that such a finding involves the evidentiary support

of the allegation upon that vital factual element contained in paragraph numbered 5 of Count I of the Second Amended Petition, supra, and constitutes an answer, favorable to the plaintiffs, respecting the test of the defendant's liability prescribed by the trial judge in his charge to the jury (see second quotation, supra, from charge.)

repetition to the evidence, supra, respecting (1) the physical plant of the elevator, especially its section which was the situs of the soybean receiving operation, and the steps taken successively in the acceptance of delivery of, and the usual method of testing and determining the price and the making of payment for, each truckload of the commodity; (2) the identification by their respective titles, duties and functions in the receiving process, physical stations, and manifest opportunity for, and practical necessity of, observation, on their part, of the details of the delivery activity, of all the personnel of the receiving department, namely, the "sampler," the "inspector," and the "weigher." Their positions were such that in practical day to day business, subject, of course, to appropriate supervisory inspection, they performed the real work of inventory acquisition. That evidence was adequate to support a finding by the jury that from the admission to the elevator of a driver with his truck and cargo, through the several steps that ensued thereafter and up to the delivery to the driver, following the dumping of the cargo, of the completed and all important "scale ticket," and the driver's movement forward to the office, that section of the interior of the elevator itself, the driver, the truck, and, during and until the end of the dumping of the cargo, the soybeans themselves, were the natural subjects of the scrutiny of one or more of these three employees. It was also adequate to support a jury's finding that in the nature of their employment, locations and tasks, the virtually constant exercise by them of such scrutiny was a positive duty, the failure to bestow it a breach of trust amounting to dishonesty.

Recalled, too, without repetition or elaboration are the fire in the dryer and its causation of the imperative frustration through December, 1959, of executive, or "top" normal, supervision in the delivery area, with supervisory personnel, even the superintendent and assistant superintendent, engaged in relatively constant repair work several floors above the delivery area. They provided, or might be found by a jury to have provided, at least a climate or setting in which the loss was caused.

That setting existing, there was evidence to show that in the sales and deliveries of soybeans by Krana and his associates and employees, the use of trucks was initiated and carried on through a considerable part of December, 1959, and that, though not immediately, the Krana group's activities fairly early, excited suspicion, for several reasons, including the relatively concurrent arrival in unbroken, or rarely interrupted, continuity of the Krana trucks for each delivery day, partly because of such timing of arrivals, partly by reason of loitering by drivers of Krana trucks in the delivery area, somewhat apart from their respective trucks, where they were not expected, and had no cause, to be. The concurrence, in point of time, of the interval of "Krana outfit" deliveries, and the onset of the inventory shortage is recalled.

Much evidence before the jury disclosed to its members a fairly wide variety of techniques whereby the purchaser at the elevator of soybeans delivered in motor truck loads could fraudulently or dishonestly be caused to pay sums of money in excess of the proper prices for the soybeans actually delivered. These were said by testimony to include (a) tampering with the actual weighing operations whereby the gross weight would be magnified, or the tare weight minimized, or both, either by the weigher's precipitating of the taking and recording of the gross weight at the highest weight point of the scale's oscillating weight indicator's arc, or by his precipitation of the taking and recording of the tare weight at the lowest weight point of such oscillating weight arc;[20] (b) manual

20. After the occurrence of the loss in suit and its discovery and confirmation, this possibility was prospectively intercepted by the installation on the scale of an automatic weighing timer which prevented the taking and recording of any weight until the oscillating weight indicator should come to rest at the true weight, or otherwise than while it should remain at rest.

tampering with such weight indicator by stopping it arbitrarily for weighing, and recording it at a point other than its arrival at "balance;" (c) the descent by a person into the scale pit (a pit about six feet deep, fifty feet long, and twelve feet wide, located beneath the scale floor, to which entrance may be gained at intervals while the scale platform is elevated, and possibly also by opening a small iron plate trapdoor in the floor of the scale house, within which pit the scale's "knives" or pivot points are located) and, by applying weight or pressure on the pivot points, altering the weights in their reflection at the point of weight indication; and (d) by the use, and the recording on "sample tickets," and, consequently, thereafter on scale tickets, of fictitious or substituted truck license registration numbers on which were entered ostensible scale weight readings of soybeans not actually dumped and delivered into the elevator, accomplished through the use of wholly fictitious weights, or by the repetitious use of a weight once actually taken, and thereafter fraudulently reused, of a real delivery once made.

From the whole evidence, supra, relevant to the details of the delivering of soybeans by motor truck, including the proximity to, and actual participation in, the successive steps in such delivery, first, of the "sampler," next of the "inspector," and ultimately of the "weigher," thus from the entry, to and including the cargo dumping and departure, of each truck, there was abundant support for a finding by the jury that every operation in the sequence was within the normal observation of one or more of those three responsible employees; that each one of them should have seen and observed any wrongful or irregular act or omission occurring while the vehicle, its cargo or its driver, or all of them, was or were within each such employee's range of vision and observation. An affirmative finding upon the question of such actual observation is supported, if not actually compelled, by the very physical nearness, and favored position of each such employee, with respect to the things with which he worked. And at least two witnesses familiar with the elevator and its operations testified to the high probability, in fact the virtual certainty, of such observation of every operation in the consecutive process by one or more of those three employees. The existence of such observation on the part of the weigher was especially supported by evidence. The weighing was done not only under his close personal scrutiny, but in its vital phase, actually by him. The dumping of the cargo resulted, except for occasional self dumping trucks, from his personal act in tripping the dump with the truck standing immediately before him; and, as it appears, invariably, the descent of the cargo occurred within his close observation, near enough to warrant the inference that he should be found to have been able to detect a substantial shortage in the descending cargo, whose gross weight (inclusive, of course, of the truck's weight) he had so recently determined, and whose net weight he could, from experience, readily comprehend in consequence of his familiarity with truck weights.

■ There was, indeed, evidence from which the jury might have found that, if and to the extent that, any portion of the inventory shortage resulted from the recording of excessive gross weight or of minimized tare weight in consequence of the wrongful operations of a person concealed, during the weighing, in the scale pit, none of the three employees lately mentioned would necessarily have observed the presence in the pit of the culprit. But there was also evidence that while it was possible for a person secreted in the pit, to enter it, effect his mischief, and leave it without physical injury, such action of entry and departure, and intervening presence in the pit, was dangerous and might result, though it would not necessarily result, in harm to the intruder. And, it was for the jury to determine, whether, mindful of such peril as existed, a person might be found to have entered, and briefly to have remained in the pit. There was, of course, no evidence of the actual sur-

reptitious entry into, or presence in the pit, of anyone during a weighing operation.

In any event, the whole matter of the observation of any actual wrongdoing or suspicious conduct, in the view most favorable to the defendant, was upon the record, submissible to the jury. And to the extent that its verdict, after an unchallenged charge, rests upon a finding favorable to the plaintiffs upon that point, it may not be disturbed by this court.

The evidence bearing upon the employment by the so-called "Krana outfit" of fictitious motor vehicle license plates as a mask or diversionary device to conceal or obscure the successful procurement by the men thus characterized of pay for ostensible loads of soybeans, either wholly undelivered or substantially magnified in weight, was largely—not quite entirely— provided by a deposition of one Henry Reis-El Bara, an investigator in the employment of the Internal Audit Division of the Agricultural Marketing Service, United States Department of Agriculture. His investigation of the instant inventory shortage, and his testimony covered, but was not limited to, that facet of the case, and was inspired by the possible interest of the United States government in consequence of its financing of the pertinent Agricultural program. His evidence need not be fully recalled, or even comprehensively synopsized at this point. It does, however, disclose that, of the many motor trucks used in the trips to the St. Louis elevator by or for Krana, Reis-El Bara obtained, from the elevator's record of the shipments of soybeans by truck, the state registration numbers of several; that he ascertained from the public records the description and identity of some, but not all, of the vehicles for which such licenses were issued, and in effect during December 1959; that, in an effort to inspect those vehicles, he located several, but by no means all of them; that of those so located he photographed some; and that,

as that witness testified, and the defendant admitted for the record, during the trial, none of those vehicles whose photographs were produced as trial exhibits was of such size or character as to be usable at all for the transportation to market of soybeans or other grain; and the testimony disclosed that, actually, they included two varieties of small panel trucks and a cement mixer, notwithstanding which the records of the appearances of vehicles bearing those three number plates showed them to have delivered to the elevator cargos, for which Norris Grain Corporation paid Krana, whose weights were said to have been respectively 51,560 pounds, 52,580 pounds, and 58,500 pounds, i. e. 859 bushels, 975 bushels, and 876 bushels of soybeans.

There was evidence before the trial court to the direct effect that:

(a) Promptly on being alerted to the possibility of an inventory shortage in its supply of soybeans, Norris Grain Corporation employed Haskins & Sells, of Chicago, Illinois, an established auditing firm, which, by one Sylvester M. Koons, one of its employees and a Missouri Certified Public Accountant, made an examination into the records and inventories of Norris Grain Corporation, including the records of basic inventory and purchases and sales, and closing stock on hand (ascertained by an actual weigh-up), and determined and reported that as of January 8, 1960, there was a shortage of 41,216 10/60 bushels of soybeans at the St. Louis Elevator, to all of which Mr. Koons as a witness testified at the trial;

(b) under similar employment in behalf of Norris Grain Corporation, one Jerome Kappenmacher, an Illinois accountant, and an employee of David Himmelblau and Company, Chicago accountants, with the aid of supporting assistants, conducted an exhaustive audit of the operations in soybeans by Norris Grain Corporation at the St. Louis elevator from July 1, 1959 [21] to

---

21. July 1, 1959 was selected as the starting date for the reason that as of June 30, 1959, the end of Norris Grain Corporation's fiscal year, it had no soybean inven-

the end of January, 1960; in such audit reconstructed every soybean purchase and sale from July 8, 1959 to the end of January, 1960; verified by actual weight the accuracy of the closing inventory for the audit period; made a complete verification through the entire month of December, 1959 in respect of all grains other than soybeans [22] in the elevator to determine whether, in that period, any other grains had been commingled, in a bin or grain storage tank, with soybeans; ascertained that all grains stored in the elevator were correctly stored in bins or tanks identified for their respective storage in the records of the elevator; and found and reported—and Mr. Kappenmacher so testified—that for the period of time covered by the audit, the total bushels of soybeans shown to have been purchased, exceeded the total bushels of soybeans sold, plus the closing inventory of soybeans, by 41,216 bushels, and that in terms of money that shortage amounted to $83,998.00 and a few cents;" and also that the loss and shortage occurred in December 1959;

(c) from his detailed examination and investigation the witness Reis-El Bara concluded, and testified, that the shortage and resultant loss occurred in December 1959, basing his conclusion and testimony upon the disparity between the estimate of soybean inventory arrived at from a bin sounding as of the end of November, 1959, and the determined inventory as of January 8, 1960, with adjustments for intervening purchases and sales as reflected by the books and records of Norris Grain Corporation, and in recognition of his conviction that no considerable shortage could have arisen in the first eight days of January, 1960; and,

(d) from John C. Schafer, an Illinois and Indiana Certified Public Accountant, a partner in the Chicago, Illinois accounting firm of John E. Burke and Company, (who under employment by the defendant had examined the records of Norris Grain Corporation relevant to the subject over the period July 1, 1959 to January 30, 1960) [23] testified, as a witness on direct examination in defendant's behalf, that for that period, an inventory shortage of 41,216 bushels of soybeans existed, and on cross-examination that it was a fact that Norris Grain Company (sic) paid for 41,216.10 bushels of soybeans that it never received, both such statements having obvious reference to the overall period in this subparagraph mentioned, and not being pinpointed to the single month of December 1959.

In the way of evidence, supportive of plaintiffs' claim, there was testimony, impressive in its significance, which was adequate to repel any inference that the shortage here involved could reasonably be attributed to any causation other than that advanced by the plaintiffs. Thus, there is evidence in the record that it would have been impossible for a person or persons unknown, and also not an employee or employees of the elevator, or even for a former employee, to remove from storage in the elevator, or from bins in the elevator, soybeans in the quantity involved. Such a removal, the evidence asserts, would require an intimate knowledge of the elevator itself in order to load out that amount, or any amount, of grain. Its taker or takers would have to know where to start the "leg," the conveyor belts, where to set the spout; he or they would have to "know the elevator." But even the possession of such knowledge would not suffice. It was testified that it would be requisite to such removal also that the remover possess

tory whatsoever; and July 8, 1960 was the first day thereafter on which it acquired any of that commodity.

22. In their audit, the auditors encountered a notation that led them to suspect the possibility of a minor commingling of

soybeans with some other grain. The study here mentioned eliminated such an occurrence.

23. That appears from the whole record to be the correct interval.

the status of an existing employee, for "he couldn't get a car to load it out in (sic) without ordering it from the railroad company. The same would be true of a barge," except, of course, that the barge would be obtained from an operating barge line. A barge load of soybeans was shown to contain approximately forty thousand, or forty-five thousand bushels.

Besides, there was evidence before the jury that in the audits the actual outbound withdrawals of soybeans for the examined periods were in balance with the records thereof.

During his direct examination as a witness for defendant, Joseph C. Schafer, a Certified Public Accountant, supra, stated that, in his investigation of the Norris Grain Corporation records, he found what he called "one discrepancy." He explained that it consisted of a shipment record of Norris Grain Corporation, representing billings to Pike Grain Company, a customer, of three invoices of soybeans, all dated December 2, 1959, in quantity aggregating forty thousand bushels, all loaded on a single numerically identified barge. He spoke of it as "a discrepancy" because, as he testified, "these three invoices were entered in the record and they were stricken," by which he declared himself to mean, "lines were drawn through the entries." Recalled later in the day for further cross-examination, he testified that during his inspection of the Norris Grain Corporation records, he was told (evidently by someone in the Norris office) that those entries on the bargeload of forty thousand bushels of beans were erroneous and were later cancelled, and that the beans were actually shipped and billed for the account of Sparks, Waters, Farnen, St. Louis, Missouri. He also indicated that he did not verify the cancelled entry by resort to Pike Grain Company. And he attributed such omission to the refusal of an officer of Norris Grain Corporation to allow a letter of inquiry in the name of Norris Grain Corporation addressed to Pike Grain Company to be transmitted. The significance of that so-called "dis-

crepancy," if it be so, was manifestly a matter of evaluation by the jury. But this observation may be made. It has to be regarded in the light of the fact that Mr. Schafer himself "admitted as a fact" that Norris Grain Company (sic, evidently meaning "Corporation") "paid for 41,216.10 bushels of soybeans that they never received."

Here again, the evidence also supports a finding of concurrence between the corporate records of sales of owned soybeans, and the quantity of soybeans actually shipped out of the elevator.

■ The evidence is convincing that Norris Grain Corporation's purchase and receipt through delivery by motor truck of soybeans was the operational department or area within which the shortage occurred. The evidence pertinent to that operating phase of the enterprise has already been discussed and considered at great, undoubtedly excessive, length, and will not be repeated. Concerning it, this court concludes, first, that the evidence abundantly supports a finding that the actual inventory shortage of 41,216 bushels by weight of soybeans, having a value of $83,998.00, occurred in that department of the business of Norris Grain Corporation; that it occurred between December 1, 1959 and December 31, 1959; and a further finding that the evidence submitted conclusively establishes that the loss was in fact due to the fraud or dishonesty of one or more of the employees of the Assured sustaining the loss.

Point I is concerned, first, with the actual occurrence of the loss, secondly, with the conclusive establishment by the evidence that the loss was in fact due to the fraud or dishonesty of one or more of the employees of Norris Grain Corporation. Considering the former of those two aspects already to have been discussed, the latter is approached. The defendant argues that plaintiffs failed to "establish conclusively that the loss was in fact due to the fraud or dishonesty of one or more of said employees," and by way of particularization, asserts that in the absence of direct proof, "plaintiffs

further failed fairly and reasonably to exclude all other explanations for the alleged loss than that it was caused by the dishonest act or acts of an employee or employees." It will have been observed that it was precisely such proof that Chief Judge Harper required, supra, in his charge as the primary premise for the jury's finding and return of a verdict for the plaintiffs in respect of the basic claim of the alleged shortage. And, having returned a verdict for the plaintiffs, and against the defendant, in the face of that charge, it is reasonable to conclude that the jury in its deliberation found that the plaintiffs had made such proof.

The trial judge was, and this court is, aware of the language of the insurance contract in suit requiring by a proviso that, in cases of this character in which the offending employee is or employees are, unidentifiable, "the evidence submitted—(in case of inventory shortage, conclusively) establish(es) that the loss was in fact due to fraud or dishonesty of one or more of the said employees." Essentially identical contracts have undergone instructive construction and application.

The allusions already made herein to the loss in suit, as arising out of an "inventory shortage," are prompted by the circumstance that the case appears to have been tried and submitted upon that theory. In what briefly follows, this court will persist in that characterization, without however, explicitly deciding that the use of the term is strictly correct. Doubt may be perceived concerning its technical applicability to a shortage rooted in the failure actually to introduce grain purchased and paid for into the buyer's supply on hand of the commodity involved. But the distinction appears not to have been squarely and explicitly advanced in this record.

But, treating the loss as the result of an inventory shortage, and the contractual language, "provided that the evidence submitted * * * (in case of inventory shortage conclusively) establishes that the loss was in fact due to the fraud or dishonesty of one or more of the said employees," as limiting coverage, the legal significance and effect of the word "conclusively" is to be understood.

In Morrow Retail Stores, Inc. v. Hartford Accident & Indemnity Company (D.C.Ida.) 111 F.Supp. 772, an insurance policy essentially indistinguishable from the one before this court was involved, and the court, determining the case without a jury, used this language:

"In deciding what meaning should be given to the words 'conclusive evidence,' when used in an insurance policy, the context in which they appear and the purpose which the parties to the contract evidently had in mind should be considered. The words should be given a reasonable construction consistent with such purpose. Here, if the assured is to be held to the high degree of proof, which defendant argues should be required, the insurance coverage of inventory shortage, caused by dishonest acts of unknown employees, would be practically valueless. Manifestly it would be out of the question for the assured to prove incontrovertibly, or beyond the possibility of error, that a shortage of merchandise, disclosed by the taking of a physical inventory, was due to the dishonesty of some employee in a situation where the identity of the culprit was unknown to the assured. The cause of the shortage could be proved only by circumstantial evidence and by a preponderance of the probabilities, as the plaintiff has undertaken to prove it in the present case.

\* \* \* \* \* \*

"In the instant case, the conclusive evidence requirement of the insurance policy evidently was intended to put upon the plaintiff the burden of showing by a degree of proof higher than a mere preponderance of the evidence that its inventory shortage was due to employee dishonesty. However, when the requirement is given a reasonable construction, consistent with the terms

of the insurance contract as a whole, it does not appear to necessitate the adduction of incontrovertible, beyond possibility of contradiction, proof, but only evidence that is clear, satisfactory, and convincing to the trier of the facts. The court finds that the evidence offered by the plaintiff measures up to that standard."

Savannah Wholesale Company v. Continental Casualty Company ( 5 Cir.), 279 F.2d 706, 708, involved an action by a wholesale dry goods concern upon a policy of insurance against any loss resulting from dishonesty on the part of its employees, which contained a condition indistinguishable from, actually identical with, the one now before the court. Upon trial to a jury, the trial judge considered the evidence insufficient to support a verdict in favor of plaintiff and against the defendant. The plaintiff had presented evidence that in an interval defined it had sustained a large reduction in gross profits despite a consistent pricing policy, and, without direct evidence of abstraction of merchandise, presented evidence of its discovery that a roof hatch of its building was open which had previously been latched from the inside, and that merchandise could have been removed through it. The Court of Appeals reversed and remanded the action for a new trial. In its discussion, that court says:

"It is well settled that the policy here in question requires only that the insured prove his claim by a preponderance of the evidence. Indeed, the appellee makes no attempt to controvert this settled principle of law, but contends rather that the evidence in this case does not call for its application. We do not agree. The appellant has offered evidence to exclude every reasonable hypothesis other than that of employee dishonesty. Moreover, it has offered some directly affirmative evidence to support the hypothesis of such dishonesty. If the jury chose to give full credit to the testimony of all of appellant's witnesses, it could quite reasonably conclude that the gross profit discrepancy was not due to any sort of clerical error or defect in the conduct of the business. The inference of theft would then be a permissible one. As between the possibilities of theft by an outsider, which would not be covered by the policy, and theft by an employee, which would be covered, the evidence that the hatch had been opened from the inside would justify a reasonable choice of the latter."

It is observed that one judge dissented from the ruling last mentioned. That, however, serves rather to emphasize the maturity of the consideration for, than to impair the significance of the prevailing opinion.

Instructive to like general effect, see Alexandre of London, Washington, D. C. Corporation v. Indemnity Insurance Company of North America (D.C.) 182 F. Supp. 748, and New Amsterdam Casualty Company v. W. D. Felder and Company (5 Cir.) 214 F.2d 825.

The defendant cites in this connection, and relies upon, two reported opinions, Cobb v. American Bonding Company of Baltimore (5 Cir.) 118 F.2d 643, and Gaytime Frock Company v. Liberty Mutual Insurance Company (7 Cir.) 148 F.2d 694. It is mentioned in passing that the opinion in the Gaytime Frock Company case expressly rests in part on that in the Cobb case. Each of the cases may be regarded as declaring that a verdict may not rest upon mere guess or conjecture, and where the probative force of all the evidence for the plaintiffs does not go beyond the point of creating a mere surmise or suspicion, it becomes the duty of the trial court to instruct a verdict for the defendant. No question of the correctness of that statement is advanced or could be sustained. Its present infirmity lies in the fact that it is inapplicable before the instant record, supra. Moreover, the Cobb ruling is not instructive in this litigation because its second numbered syllabus and an observation at page 644 of 118 F.2d disclose

that, in the Cobb case there was proof by the plaintiffs only that "inventory shortages existed from time to time in eight of the stores," which the court held to be *"insufficient to establish that such shortages were due to 'dishonesty' of an employee or employees where, under the bookkeeping system employed by plaintiffs, shortages would be reflected by a number of things other than dishonest conduct of employees."* (Emphasis added.) A comparable situation does not exist here, where, while the evidence includes suggestions of possible inventory shortage producing techniques, the evidence in behalf of the plaintiffs is sufficient to warrant a finding by the jury excluding all such supposed causes, other than the fraud or dishonesty of an employee or of employees, acting alone or in collusion with others.

Before proceeding beyond Points I and II, this court adverts to the aspect of Point II which asserts the absence of evidence of any probative value to establish that a loss in the amount claimed was incurred by plaintiffs during the month of December, 1959. The causation of the loss and its amount have already been sufficiently considered in relation alike to Point I and to Point II. Only brief attention need be given to the defendant's contention asserting the destitution of proof of the onset of that loss in December, 1959. Two features, one factual, the other legal, render that contention invalid.

Without elaboration or repetition, it is recalled that as a matter of fact, there is much evidence fixing the month of December, 1959 as the interval of time within which the shortage resulted. Count I of the Second Amended Petition declared that the shortage and resulting loss occurred "during the term of said policy and more specifically during the period from December 1, 1959 to December 31, 1959." And the proof conformed strictly to that averment. There was and is not even a minor variation between pleading and proof; and if there were it could readily have been, or even yet be, corrected in furtherance of justice.

But an additional consideration is noted. In the light of the claim set out in the Second Amended Petition, it was unnecessary that there be such strict correspondence of proof to pleading.

■ It is textually said that, "Ordinarily, allegations of time are immaterial, and need not be proved as laid. Such allegations, however, may become material, when descriptive of the subject of the action." 71 C.J.S. Pleading § 543, p. 1108. Representative of occasions when such allegations are material, offered suggestively but not exclusively, are actions in which it is necessary to establish a critical time as being within the effective period of an insurance policy to recover on which suit is brought; actions in which it is necessary to plead and establish the time of the accrual of a claim, with relation to an applicable statute of limitations; and, in general, proceedings in which the precise date of an event in controversy lies at the root of the litigation. But this proceeding involves no such problem. Whatever the interval which spanned the shortage, it was within the acknowledged term of the policy.

This court, therefore, concludes that the defendant's position reflected in its argued Points I and II is not well taken either in its entirety or in either of its parts.

There remains its Point III, wherein it argues that no evidence was presented in behalf of the plaintiffs to prove that the refusal by defendant to pay to the plaintiffs their claim on which the suit is based was actually vexatious as required by section 375.420 RSMo 1959, V.A.M.S., under which imposition of a penalty for vexatious refusal to pay is authorized.

Approaching the consideration of defendant's Point III, supra, this court is confronted with a substantially undocumented assertion in plaintiffs' brief on appeal that at no place at trial, or in its motions after the trial, or at all prior to the service and filing of its brief on this appeal, did the defendant question the sufficiency of the evidence to establish vexatious delay. On which account, plaintiffs add the assertion that the de-

fendant's present position has been waived. A search of the record appears to support the plaintiff's contention touching the defendant's inaction. Yet, in default of an orderly presentation of the question of waiver, this court is disinclined to resolve the question under defendant's Point III on that ground. That question has been presented here on its merits.

By section 375.420, Vernon's Annotated Missouri Statutes, it is provided that:

"In any action against any insurance company to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict."

Without repetition, attention is directed to the language quoted from the trial judge's charge to the jury, wherein and whereby he submitted the question of vexatious refusal to pay on the part of the defendant.

There is an abundance of legal literature wherein Section 375.420, V.A.M.S. has been construed and applied. From it is selected a portion of a discussion by the St. Louis Court of Appeals, speaking through the Honorable M. C. Matthes, then a judge of that court, now a judge of this court, in Yankoff v. Allied Mutual-Insurance Company (Mo.App.) 289 S.W. 2d 471. It follows:

"The statute, Section 375.420 RSMo 1949, V.A.M.S., which is the basis for the imposition of the penalty and attorney's fee, has received repeated attention of the courts. Consequently its meaning and application are well defined. The rule is that while affirmative proof is not required to show vexatious refusal, the penalty should not be inflicted unless the evidence and circumstances show such refusal was willful and without reasonable cause as the facts appeared to a reasonable and prudent man before the trial. Merely because the judgment after trial is adverse to defendant's contention is no reason for inflicting the penalty. Patterson v. American Ins. Co. of Newark, N. J., 174 Mo.App. 37, 44, 160 S.W. 59, 62; Burneson v. Massachusetts Bonding & Ins. Co., Mo.App., 205 S.W.2d 239; Adams v. State Auto Ins. Ass'n of Des Moines, Iowa, Mo. App., 265 S.W.2d 738, loc. cit. 741; Jones v. Farm Bureau Mutual Ins. Co., Mo.App., 284 S.W.2d 11, loc. cit. 15; Missouri Digest, Insurance, ☞602, 602.1, 602.2, 602.3. Conversely, the penalties do apply and vexatious refusal to pay does become a jury question when the facts and circumstances support a conclusion that the refusal was willful and without reasonable cause. Burneson v. Massachusetts Bonding & Ins. Co., supra, Mo.App., 205 S.W.2d 239, loc. cit. 242, and cases cited."

In the early case of Keller v. Home Life Insurance Company, 198 Mo. 440, 95 S.W. 903, at page 909, the court, in affirming a judgment on a verdict for plaintiff in an action in which an instruction allowed the application of the statute now involved, said:

"It is, however, insisted that there was no testimony upon which to base such instruction. The question of vexatious, delay on the part of the defendant in paying this death claim was one of fact to be determined by the jury. It was said by this Court in Brown v. Ry. Association Assurance Co., 45 Mo. [221] loc. cit. 227, that 'the whole question of vexatious refusal or delay is a matter of fact to be determined by the jury. They must make up their verdict on this issue by a general survey of all the facts

and circumstances in the case; and if, upon a full consideration, they conclude that the refusal was unjustifiable and vexatious, the law authorizes them to assess the damages. The statute will not admit of the construction contended for by the counsel for the plaintiff in error, that before damages are allowed it must be explicitly proved by the plaintiff that the delay or refusal was vexatious.' In our opinion the record discloses sufficient evidence to warrant the court in submitting the question of vexatious delay in the payment of this claim to the jury, and we shall not undertake to usurp the province of the jury and retry such question upon this appeal."

And in Curtis v. Indemnity Company of America, 327 Mo. 350, 37 S.W.2d 616, 628, the following discussion supportive of the submission of the issue of vexatious refusal to pay is disclosed:

"Appellant complains of the submission of the issue of defendant's vexatious refusal to pay the loss under the policy of insurance, and assigns error in the refusal of its requested instructions designed to withdraw such issue from the consideration of the jury. Appellant urges that, under the previous ruling of this court, 'defendant is to be allowed to entertain an honest difference of opinion as to its liability, or as to the extent of such liability under the contract of insurance, and to litigate that difference.' Non-Royalty Shoe Co. v. [Phoenix] Assurance Co., 277 Mo. 399, 422, 210 S.W. 37, 43. It is insisted by appellant that its failure to pay the loss promptly, and without litigation, is attributable wholly to plaintiff's unreasonable demand for the payment of the face amount of the policy of insurance, and to a reasonable doubt, arising out of all the facts and circumstances connected with plaintiff's demand, as to defendant's liability, and as to the extent thereof, under the terms and provisions of the policy of insurance.

"This court has uniformly construed the meaning of the statute (section 6337, Rev.St.1919) to be that, 'when an insurance company has, without reasonable or probable cause or excuse, obstructed a beneficiary by refusing to pay his loss under its policy, he may be allowed in his suit thereon the penalties prescribed by the statute.' State ex rel. Gott v. Fidelity & Deposit Co., 317 Mo. 1078, 1095, 298 S.W. 83; Block v. United States Fidelity & Guaranty Co., 316 Mo. 278, 305, 290 S.W. 429; State ex rel. Northwestern Nat. Insurance Co. v. Trimble, 322 Mo. 1236, 18 S.W.2d 21, 22. It has been said by the Kansas City Court of Appeals, and quoted approvingly by this court in the Non-Royalty Shoe Co. case, supra, that 'while affirmative proof is not required to show vexatious refusal, yet the penalty should not be inflicted unless the evidence and circumstances show that such refusal was willful and without reasonable cause as the facts appeared to a reasonable and prudent man before the trial; and merely because the judgment, after trial, is adverse to defendant's contention, is no reason for inflicting the penalty.' Patterson v. American Ins. Co., 174 Mo. App. 37, 44, 160 S.W. 59. However, if the reasonable inference may be drawn from a general survey of all the facts and circumstances in the case that the defendant's refusal to pay the loss under the policy of insurance was without reasonable or probable cause or excuse, then the issue of defendant's vexatious refusal to pay the loss is properly submissible to a jury. Fay v. Aetna Life Insurance Co., 268 Mo. 373, 390, 187 S.W. 861; Young v. Penn. Fire Insurance Co., 269 Mo. 1, 21, 187 S.W. 856; Keller v. Home Life Insurance Co., 198 Mo. 440, 460, 95 S.W. 903."

See also, among many other authorities that might be cited, American Indemnity Company v. Swartz, (8 Cir.) 250

F.2d 532, 538, 539; New York Life Insurance Company v. Calhoun, 8 Cir., 114 F.2d 526; Hunt v. United States Fire Insurance Company of New York, 239 Mo.App. 625, 193 S.W.2d 778, 786, 787, 788; Volz v. Travelers Insurance Company (Mo.App.) 161 S.W.2d 985, 994; Aufrichtig v. Columbian National Life Insurance Company, 298 Mo. 1, 249 S. W. 912; and Non-Royalty Shoe Company v. Phoenix Assurance Company, 277 Mo. 399, 210 S.W. 37.

In the light of the liberal standards, by Missouri's courts erected, for the administration and application of Section 375.420, Vernon's Annotated Missouri Statutes, and of the whole evidence in this case, and appreciatively mindful of the highly penal character of the statute and of its sanction, the court is persuaded that the trial judge was entirely warranted in imparting to the jury the portion of the charge pertinent to that statute, and that, in such phase of the charge, he proceeded correctly. That portion of the instructions, in like manner as the rest of the charge, was given without exception, either on the score of the propriety of any charge upon the subject, or for any error in the content of the charge. This court is in nowise moved to that conclusion by the return of the verdict for the plaintiffs upon the principal claim in suit. It is simply convinced that the record discloses evidence and a setting of litigation from which, upon mature study and reflection, the jury was warranted in concluding that, in denying liability and refusing to pay, under the policy, the defendant's course was willful and without reasonable cause, as the facts appeared to a reasonable and prudent man before the filing of this suit. And upon the merits of the issue of the defendant's willfulness and want of reasonable cause in its refusal, the jury's verdict is controlling.

After the foregoing discussion, it remains only to say that, upon due and respectful consideration of the defendant's several assignments of error, this court concludes that the proceedings and judgment of the trial court are free from error. And, without their unnecessary reiteration (*vide* supra), that announcement applies, severally and in their entirety, to the grounds, both those argued here and those not explicitly argued, of the defendant's combined motions (a) to vacate and set aside verdict and judgment, and to enter judgment in favor of the defendant, or (b) alternatively to set aside the verdict and judgment, and to grant a new trial herein.

The judgment is, therefore,

Affirmed.